IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

ERIC GERSBACHER,

                                                          INDEX NO.  14cv7600(VSB)
                                                          ECF CASE
                          PLAINTIFF.


              vs
                                                          COMPLAINT
THE CITY OF NEW YORK, a municipal entity,                 [JURY TRIAL
NEW YORK CITY POLICE OFFICER GONZALEZ,                    DEMANDED]
NEW YORK CITY POLICE OFFICER RAMIREZ,
NEW YORK CITY DEPUTY INSPECTOR EDWARD
WINSKI, NEW YORK CITY "John Doe" POLICE
OFFICERS 1-10,

                          DEFENDANTS.

_____


        Plaintiff ERIC GERSBACHER, by his attorneys, STECKLOW COHEN &
THOMPSON, complaining of the defendants, respectfully alleges as follows:

### I. PRELIMINARY STATEMENT

    1.    Plaintiff ERIC GERSBACHER bring this action for compensatory damages,
punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988
for violations of his civil rights, as said rights are secured by said statutes and the
Constitutions of the State of New York and the United States.

    2.    On the morning of Tuesday, September 20, 2011, Plaintiff ERIC GERSBACHER
was present in Zuccotti Park ("the park") as a bystander and observer of Occupy Wall
Street ("OWS"). OWS began on September 17, 2011 and is a collection of individuals
and ideas that, *inter alia*, seek to call attention to and change inequalities and ill effects
created through government-driven and corporation-favoring policies and practices that
prevent a vast majority of individuals from enjoying the rights, liberties, and freedoms
guaranteed to them by the United States Constitution.

    3.    In the early days of OWS' gathering at Zuccotti Park, a privately owned public
space in lower Manhattan, NYPD officers led and commanded by First Precinct
Commander Defendant NEW YORK CITY DEPUTY INSPECTOR EDWARD WINSKI
("Defendant DEPUTY INSPECTOR EDWARD WINSKI") engaged in various
intimidation and harassment tactics designed to deter and chill the First Amendment
protected expression of OWS participants and observers, including Plaintiff ERIC
GERSBACHER.

4.    At or around 10:00 AM on Tuesday, September 20, 2011, Plaintiff ERIC GERSBACHER was sitting on a blue tarp in Zuccotti Park, when Defendant DEPUTY INSPECTOR EDWARD WINSKI unlawfully and improperly ordered him to move, despite the fact that Plaintiff ERIC GERSBACHER was engaged in no unlawful activity or disorder. Shortly thereafter, one of the Defendant NEW YORK CITY "John Doe" POLICE OFFICERS (Collectively, "Defendant "John Doe" POLICE OFFICERS," Individually "Defendant "John Doe" POLICE OFFICER") pulled at Plaintiff ERIC GERSBACHER's shirt. Plaintiff then stood up and complied with Defendant DEPUTY INSPECTOR EDWARD WINSKI's unlawful order, walking in the opposite direction of the Defendant "John Doe" POLICE OFFICERS. One or more of the Defendant "John Doe" POLICE OFFICERS then grabbed Plaintiff ERIC GERSBACHER, picked him up, carried him over the tarp, and dropped him on the ground beside the same.

5.    The Defendant "John Doe" POLICE OFFICERS then pinned Plaintiff ERIC GERSBACHER to the ground, preventing him from breathing, and ignored his screams and pleas that he could not breathe, and refused to allow him treatment for his asthma, causing him to fear for his life and suffer severe mental anguish and pain. The Defendant "John Doe" POLICE OFFICERS then detained Plaintiff ERIC GERSBACHER for approximately thirty-six hours and thereafter charged him with crimes and violations that were later dismissed.

## II. JURISDICTION

6.    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

7.    Plaintiff ERIC GERSBACHER further invokes this Court's supplemental jurisdiction, pursuant to 28 USC. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

## III. VENUE

8.    Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

## IV. JURY DEMAND

9.    Plaintiff ERIC GERSBACHER respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## V. THE PARTIES

10.    Plaintiff ERIC GERSBACHER is a resident of the City of Buffalo, State of New York, and the County of Erie.

11.    Defendant CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

12.   Defendant CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

13.   That at all times hereinafter mentioned, Defendant DEPUTY INSPECTOR EDWARD WINSKI, Defendant POLICE OFFICER RAMIREZ, Defendant POLICE OFFICER GONZALEZ and the Defendant POLICE OFFICERS "JOHN DOES 1-10" (collectively, "Defendant POLICE OFFICERS," individually, "Defendant POLICE OFFICER") were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

14.   That at all times relevant to this action, the Defendants POLICE OFFICERS, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

15.   Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting within the scope and in furtherance of their employment by Defendant CITY OF NEW YORK.


## VI. FACTS COMMON TO ALL CLAIMS

16.   On the morning of September 20, 2011, at or around 10:00am, Plaintiff ERIC GERSBACHER was present in Zuccotti Park ("the park").

17.   The park was and is a privately owned public space under the jurisdiction and control of the New York City Department of City Planning.

18.   At all times relevant herein, the park was open to the public twenty-four (24) hours a day.

19.   At this time, OWS participants had maintained a presence in the park for nearly three (3) days, and would not be caused to leave the park for approximately fifty-five (55) days.

20.   Even though they lacked a lawful basis to eject OWS participants and observers from the park, various police officers, including Defendant DEPUTY INSPECTOR EDWARD WINSKI and the remaining Defendant POLICE OFFICERS undertook multiple actions intended to chill and deter the First Amendment expression of the OWS participants in the park.

21.   The acts included, but were not limited to: deployment of large police presences with riot gear to surround the park at various times; the selective enforcement of various statutes and regulations against OWS participants that were not and are not generally enforced against the public at large; and uses of excessive force and improper seizures of persons and property intended to make OWS participants feel unsafe and under siege.

22.    Prior to this incident, police, including Defendant DEPUTY INSPECTOR
EDWARD WINSKI, had indicated that they would enforce New York City
Administrative Code §16-122(b), forbidding the leaving of goods or erection of structures
in public places, to remove any tarps tied to trees or otherwise secured so as to provide
shelter to OWS participants or their belongings.

23.    On information and belief, this was an empty threat, and no citations for violation
of New York City Administrative Code §16-122(b) were issued in the park to OWS
participants or others during the course of the OWS gathering at the park.

24.    Nevertheless, OWS participants complied with the unlawful and empty threats of
police, and detached all tarps in the park from any objects to which they had been
fastened.

25.    At or around the time that the events giving rise to this complaint began, Plaintiff
ERIC GERSBACHER was sitting on top of a blue plastic tarp ("the tarp"), which was
lying on the ground.

26.    The tarp was not attached or fastened to anything.

27.    The tarp had not been left in the park; it was actively being used by persons who
were present in the park at that time.

28.    At the time of the incident giving rise to this action, approximately ten (10)
Defendant POLICE OFFICERS, including Defendant POLICE OFFICER GONZALEZ
and Defendant POLICE OFFICER RAMIREZ, were standing in and around the area near
the tarp.

29.    At or around this time, Plaintiff ERIC GERSBACHER observed the Defendant
POLICE OFFICERS tackle and arrest approximately three (3) other individuals
("tackled-arrestees").

30.    At or around this time, one of the Defendant POLICE OFFICERS seized Plaintiff
ERIC GERSBACHER by his shirt from behind.

31.    Plaintiff ERIC GERSBACHER then fell on his side as a result of the same
Defendant POLICE OFFICER's act of grabbing him from behind.

32.    The Defendant POLICE OFFICERS had not issued an audible order or warning
of any kind or type before the same Defendant POLICE OFFICER seized Plaintiff ERIC
GERSBACHER from behind.

33.    After being pulled from behind by one of the Defendant POLICE OFFICERS and
subsequently falling onto his side, Plaintiff ERIC GERSBACHER asked the Defendant
POLICE OFFICER, in sum and substance, "What are you doing?"

34.    The Defendant POLICE OFFICERS did not respond to Plaintiff ERIC
GERSBACHER's question.

35.   In fear for his safety, Plaintiff ERIC GERSBACHER then stood back up, and began to move away.

36.   Plaintiff ERIC GERSBACHER then began walking in the opposite direction of the Defendant POLICE OFFICERS.

37.   One or more of the Defendant POLICE OFFICERS again grabbed Plaintiff ERIC GERSBACHER.

38.   The Defendant POLICE OFFICERS then began pulling Plaintiff ERIC GERSBACHER by his belt and collar.

39.   Two or more of the Defendant POLICE OFFICERS then picked up Plaintiff ERIC GERSBACHER, carried him for a short distance, then forced Plaintiff ERIC GERSBACHER to the ground, with his face on concrete.

40.   Several of the Defendant POLICE OFFICERS continued to use force to push Plaintiff ERIC GERSBACHER's head and face against the ground.

41.   The Defendant POLICE OFFICERS' acts of forcing Plaintiff ERIC GERSBACHER to the ground and pushing his face against the pavement caused Plaintiff to suffer severe bruises, scars, and cuts on his forehead.

42.   At or around this time, one of the Defendant POLICE OFFICERS forcefully put his full body weight on the left region of Plaintiff ERIC GERSBACHER'S back.

43.   The same Defendant POLICE OFFICER then forced his knee into the left region of Plaintiff ERIC GERSBACHER's back.

44.   Another of the Defendant POLICE OFFICERS forcefully put his full body weight on the right region of Plaintiff ERIC GERSBACHER's back.

45.   The second Defendant POLICE OFFICER then began forcing his knee into the right region of Plaintiff ERIC GERSBACHER's back.

46.   A third Defendant POLICE OFFICER forcefully put his full body weight on Plaintiff ERIC GERSBACHER's right leg.

47.   This third Defendant POLICE OFFICER then began forcing his knee into Plaintiff ERIC GERSBACHER's right leg.

48.   A Fourth Defendant POLICE OFFICERS forcefully put his full body weight on on Plaintiff ERIC GERSBACHER's left leg.

49.   This fourth Defendant POLICE OFFICER then began forcing his knee into Plaintiff ERIC GERSBACHER's left leg.

50.   A fifth Defendant POLICE OFFICERS then forcefully put his full body weight on Plaintiff ERIC GERSBACHER's arms, neck and head.

51.   One or more of the the Defendant POLICE OFFICERS pulled Plaintiff ERIC GERSBACHER's hands and arms behind his back.

52.   One or more of the Defendant POLICE OFFICERS began punching Plaintiff ERIC GERSBACHER.

53.   One or more of the Defendant POLICE OFFICERS placed plastic flexi-cuffs around Plaintiff ERIC GERSBACHER's wrists.

54.   At or around this time, Plaintiff ERIC GERSBACHER realized that he could not breathe.

55.   Plaintiff ERIC GERSBACHER has suffered from a chronic inflammatory disorder of his lungs and airways, i.e., asthma, since he was approximately seven years old.

56.   Plaintiff ERIC GERSBACHER felt as if he were breathing through a pinched straw.

57.   At or around this time, Plaintiff ERIC GERSBACHER told the Defendant POLICE OFFICERS, in sum and substance, "I cannot breathe."

58.   The Defendant POLICE OFFICERS did not respond to Plaintiff ERIC GERSBACHER's plea.

59.   Plaintiff ERIC GERSBACHER then exclaimed to the Defendant "John Doe" POLICE OFFICERS, in sum and substance, "I am having an asthma attack!"

60.   The Defendant POLICE OFFICERS did not respond, but instead continued to apply force against Plaintiff ERIC GERSBACHER in order to keep him pinned to the concrete.

61.   Asthma attack symptoms include, though are not limited to, wheezing, chest tightness, and coughing, and an untreated asthma attack can be fatal.

62.   By exclaiming that he was having an asthma attack, Plaintiff ERIC GERSBACHER informed the Defendant POLICE OFFICERS that they must allow him to use, or provide him with, an asthma inhaler.

63.   Upon information and belief, an asthma inhaler provides relief during an asthma attack by relaxing the muscles in an individual's bronchial tubes and thereby allowing him or her to breathe normally.

64.   At or around this time, one or more of the OWS participants, bystanders, and observers present ("assisting bystander") told the Defendant POLICE OFFICERS in sum, and substance, "He cannot breathe. He is having an asthma attack."

65.   The Defendant POLICE OFFICERS did not respond.

66.   Assisting bystander then stated to the Defendant POLICE OFFICERS, in sum and substance, "I have an asthma inhaler, please let me help Eric."

67.   The Defendant POLICE OFFICERS did not respond to assisting bystander's statement.

68.   Instead, the Defendant "John Doe" POLICE OFFICERS continued pinning Plaintiff ERIC GERSBACHER against the concrete for approximately another two minutes.

69.   At or around this time, Plaintiff ERIC GERSBACHER exclaimed to the Defendant POLICE OFFICERS, in sum and substance, "You all are literally crushing my lungs!"

70.   After a time, the Defendant POLICE OFFICERS began shifting their collective weight off of Plaintiff ERIC GERSBACHER.

71.   Plaintiff ERIC GERSBACHER —— still wheezing heavily, suffering from shortness of breath, and experiencing pain from plastic flex-cuffs around his wrists —— then sat up.

72.   The Defendant POLICE OFFICERS then let assisting bystander help Plaintiff ERIC GERSBACHER by allowing her to apply the aforementioned asthma inhaler to Plaintiff ERIC GERSBACHER's mouth.

73.   Plaintiff ERIC GERSBACHER was thankful to breathe again, and that his asthma attack did not result in his death.

74.   Plaintiff ERIC GERSBACHER was physically hurt and embarrassed at having been subjected to the Defendant "John Doe" POLICE OFFICERS' unlawful conduct.

75.   Plaintiff ERIC GERSBACHER could not understand why the Defendant POLICE OFFICERS had subjected him to the above unlawful conduct.

76.   Upon information and belief, at no point before, during, or after the events described herein did the Defendant POLICE OFFICERS have a legitimate or legally cognizable reason for subjecting Plaintiff ERIC GERSBACHER to the above unlawful conduct.

77.   At no point before, during, or after the Defendant POLICE OFFICERS conduct did any one of the individual Defendant POLICE OFFICERS attempt to stop, prevent, or otherwise obstruct their colleagues from engaging in the same unlawful conduct.

78.   After a time, the Defendant POLICE OFFICERS lifted Plaintiff ERIC GERSBACHER off of the ground.

79.   Then, without warning or notice, one or more of the Defendant POLICE OFFICERS shoved Plaintiff ERIC GERSBACHER back onto the ground.

80.   At or around this time, the Defendant POLICE OFFICERS again forced their weight onto various regions of Plaintiff ERIC GERSBACHER's body, pinning him to the ground again.

81.   At or around this time, one or more of the Defendant POLICE OFFICERS pulled Plaintiff ERIC GERSBACHER's left arm, causing it to slip out of the plastic flexicuff previously applied.

82.   Plaintiff ERIC GERSBACHER felt lightheaded, and intensely afraid that he was being mortally injured.

83.   Plaintiff ERIC GERSBACHER then attempted to curl himself into a ball in order to prevent the Defendant POLICE OFFICERS from crushing his lungs by continuing to pin him against the ground.

84.   Plaintiff ERIC GERSBACHER attempted to curl himself into a ball in order to preserve his life.

85.   The Defendant POLICE OFFICERS then began pulling Plaintiff ERIC GERSBACHER's left arm back in order to handcuff him once more.

86.   At or around this time, Plaintiff ERIC GERSBACHER exclaimed to the Defendant POLICE OFFICERS, in sum and substance, "You can handcuff me, but please let me breathe!"

87.   The Defendant POLICE OFFICERS then pushed Plaintiff ERIC GERSBACHER farther toward the concrete.

88.   One or more of the Defendant POLICE OFFICERS then handcuffed Plaintiff ERIC GERSBACHER's left wrist again.

89.   One or more of the Defendant POLICE OFFICERS then picked Plaintiff ERIC GERSBACHER off of the ground by grabbing Plaintiff's arms.

90.   Plaintiff ERIC GERSBACHER —— again wheezing heavily, suffering from shortness of breath, and experiencing pain from plastic flex-cuffs around his wrists —— then was pulled to his feet.

91.   At or around this time, Plaintiff ERIC GERSBACHER asked one or more of the Defendant POLICE OFFICERS, in sum and substance, "What am I being charged with?"

92.   The Defendant POLICE OFFICERS did not respond to Plaintiff ERIC GERSBACHER's question.

93.   The Defendant POLICE OFFICERS then drove Plaintiff ERIC GERSBACHER to the 1st Precinct.

94.   While en route, Plaintiff ERIC GERSBACHER repeatedly asked the Defendant POLICE OFFICERS to loosen the plastic flex-cuffs around his wrists.

95.   The Defendant POLICE OFFICERS ignored Plaintiff ERIC GERSBACHER's repeated requests.

96.   Shortly after arriving at the 1st Precinct, the Defendant POLICE OFFICERS held Plaintiff ERIC GERSBACHER in the Precinct waiting area for approximately one hour,

as Plaintiff continued to experience significant pain and discomfort in his wrists from the plastic flexi-cuffs.

97.   During this hour, Plaintiff ERIC GERSBACHER observed his hands turn purple from the plastic flexi-cuffs.

98.   During this time, Plaintiff ERIC GERSBACHER asked one of the Defendant POLICE OFFICERS present in the 1st Precinct to, in sum and substance, "Please loosen or take off the plastic flexi-cuffs around my wrists."

99.   In response, the same Defendant POLICE OFFICER stated, in sum and substance, "I can make those handcuffs hurt more if you don't stop talking."

100.   After approximately an hour of waiting, one or more of the Defendant "John Doe" POLICE OFFICERS attempted to remove the plastic flexi-cuffs from Plaintiff ERIC GERSBACHER's wrists by wedging a pair of scissors in between the plastic flexi-cuffs and the skin of Plaintiff ERIC GERSBACHER's wrists.

101.   This procedure caused further pain to Plaintiff ERIC GERSBACHER's wrists.

102.   Plaintiff ERIC GERSBACHER later found several cuts and bruises along the region of his wrists where the Defendant POLICE OFFICERS had applied the plastic flexi-cuffs.

103.   One or more of the Defendant POLICE OFFICERS then walked Plaintiff ERIC GERSBACHER to a holding cell within the 1st Precinct.

104.   There the Defendant POLICE OFFICERS would detain Plaintiff ERIC GERSBACHER for approximately another eleven (11) hours.

105.   While Plaintiff ERIC GERSBACHER was detained, Defendant POLICE OFFICER RAMIREZ approached the bars of the same holding cell and stated to Plaintiff ERIC GERSBACHER, in sum and substance, "If anyone asks you whether you need medical treatment, tell them no."

106.   In response, Plaintiff ERIC GERSBACHER stated, in sum and substance, "I won't say no, I need medical treatment."

107.   Defendant POLICE OFFICER RAMIREZ then hit the bars of the holding cell in a threatening manner.

108.   While detained at the 1st Precinct, Plaintiff ERIC GERSBACHER requested medical treatment.

109.   Defendants refused to acknowledge either Plaintiff ERIC GERSBACHER's injuries or his request for medical treatment.

110.   Approximately twelve (12) hours after their initial arrest of Plaintiff ERIC GERSBACHER, one or more of the Defendant POLICE OFFICERS and Defendant

POLICE OFFICER RAMIREZ transferred Plaintiff ERIC GERSBACHER to Central Booking.

111. While Plaintiff ERIC GERSBACHER was present at Central Booking, one or more paramedics present in Central Booking asked Plaintiff ERIC GERSBACHER whether he needed medical treatment.

112. The same paramedic asked Plaintiff ERIC GERSBACHER this question while Plaintiff was in the presence of Defendant POLICE OFFICER RAMIREZ.

113. Plaintiff ERIC GERSBACHER needed medical treatment, but due to having previously been threatened by Defendant POLICE OFFICER RAMIREZ, told the paramedic that he did not need medical treatment.

114. Plaintiff ERIC GERSBACHER went before the court at or around 10:00 PM on the evening following his arrest, Wednesday, September 21, 2011.

115. Plaintiff ERIC GERSBACHER was then informed that he had been charged with Obstruction of Governmental Administration in the Second Degree ("O.G.A.2") and Resisting Arrest.

116. Both of these charges were false; Plaintiff ERIC GERSBACHER had not interfered with the police's execution of their lawful duties, and did not resist arrest.

117. Plaintiff ERIC GERSBACHER would have to return to the court on approximately four additional occasions before receiving an Adjournment in Contemplation of Dismissal for both charges, which have since been dismissed and sealed.

118. Plaintiff ERIC GERSBACHER suffered significant physical, mental, and emotional injuries as a result of being subjected to the Defendant POLICE OFFICERS' unlawful conduct.

119. Following the incident and arrest in question, Plaintiff ERIC GERSBACHER suffered prolonged pain in his back, neck, shoulders, arms, and wrists.

120. Plaintiff ERIC GERSBACHER attempted to return to the park in order to continue to lawfully exercise his First Amendment protected rights on or around Thursday September 22, 2011.

121. However, due to the physical, mental, and emotional injures he had suffered on and around Tuesday September 20, 2011, Plaintiff ERIC GERSBACHER was unable to continue participating in the lawful OWS demonstrations.

122. Due to the abuse and trauma that the Defendant POLICE OFFICERS caused Plaintiff ERIC GERSBACHER to suffer on and after the date of the incident and arrest in question, Plaintiff ERIC GERSBACHER has not returned to Buffalo State College.

123. In May of 2012 Plaintiff ERIC GERSBACHER began working in landscaping and gardening at Deeridge Farms in East Aurora, NY.

124.  Shortly after Plaintiff ERIC GERSBACHER began working at Deeridge Farms, he was terminated due to the fact that the company deemed him a threat to their security and business license as a result of the arrest at issue here.

125.  Plaintiff ERIC GERSBACHER had never been arrested prior to September 20, 2011.

126.  On information and belief, the Defendant POLICE OFFICERS' arrest of Plaintiff ERIC GERSBACHER's O.G.A.2 and Resisting Arrest charges were "cover charges" created in order to justify the Defendant POLICE OFFICERS' "Contempt of Cop" arrest of Plaintiff ERIC GERSBACHER in the absence of probable cause.

127.  On information and belief, Plaintiff ERIC GERSBACHER was arrested and brutalized in order to deter and chill the First Amendment expression of the OWS participants then present, and to send a message to the OWS movement generally that their expression would be met with violence and arrest.

128.  As a result of the foregoing, Plaintiff ERIC GERSBACHER sustained, *inter alia,* mental injuries, emotional distress, embarrassment, humiliation and deprivation of his constitutional rights.

129.  As a result of the Defendants' constitutionally violative conduct, Plaintiff ERIC GERSBACHER demands a judgment from Defendants in a sum of money to be determined at trial.

## FIRST CLAIM FOR RELIEF
## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

130.  Plaintiff ERIC GERSBACHER repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

131.  All of the aforementioned acts of the Defendant CITY OF NEW YORK and Defendant POLICE OFFICERS, (collectively, "Defendants," unless otherwise described, henceforth), their agents, servants and employees, were carried out under the color of state law.

132.  All of the aforementioned acts deprived Plaintiff ERIC GERSBACHER of the rights, privileges and immunities guaranteed to citizens of the United States by the First, and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

133.  The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

134.  The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

135.  The Defendant "John Doe" POLICE OFFICERS and Defendant CITY OF NEW YORK, collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

136.  As a result of the foregoing, Plaintiff ERIC GERSBACHER was put in fear for his safety; harassed, battered, berated, and caused to suffer significant and painful injuries to his back, neck, shoulders, arms, and wrists.

137.  As a result of the above constitutionally impermissible conduct, Plaintiff ERIC GERSBACHER was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

138.  As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## SECOND CLAIM FOR RELIEF
## FALSE ARREST UNDER 42 U.S.C. §1983

139.  Plaintiff ERIC GERSBACHER repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

140.  As a result of the aforesaid conduct by Defendants, Plaintiff ERIC GERSBACHER was subjected to an illegal, improper and false arrest by the Defendants and taken into custody and caused to be falsely imprisoned, detained and confined without any probable cause, privilege or consent.

141.  As a result of the above constitutionally impermissible conduct, Plaintiff ERIC GERSBACHER was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, legal expenses and damage to his reputation and standing within his community.

142.  As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## THIRD CLAIM FOR RELIEF
## FAILURE TO INTERVENE UNDER 42 U.S.C. §1983

143.  Plaintiff ERIC GERSBACHER repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

144.  The Defendants had an affirmative duty to intervene on Plaintiff ERIC GERSBACHER's behalf to prevent the violation of his constitutional rights.

145.  The individual Defendant POLICE OFFICERS failed to intervene on Plaintiff

ERIC GERSBACHER's behalf to prevent the violation of his constitutional rights despite having had a realistic opportunity to do so.

146.  The individual Defendant POLICE OFFICERS failed to intervene on Plaintiff ERIC GERSBACHER's behalf to prevent the violation of his constitutional rights despite having substantially contributed to the circumstances within which Plaintiff ERIC GERSBACHER's rights were violated by their affirmative conduct.

147.  As a result of the aforementioned conduct of the individual Defendants, Plaintiff ERIC GERSBACHER's constitutional rights were violated.

148.  As a result of the above constitutionally impermissible conduct, Plaintiff ERIC GERSBACHER was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

149.  As a result of Defendants' impermissible conduct, Plaintiff ERIC GERSBACHER demands judgment against Defendants in a sum of money to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**EXCESSIVE FORCE UNDER 42 U.S.C. § 1983**

150.  Plaintiff ERIC GERSBACHER repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

151.  Defendants used excessive force against Plaintiff ERIC GERSBACHER by using plastic flexi-cuffs to handcuff Plaintiff ERIC GERSBACHER when the circumstances did not create probable cause for Plaintiff's arrest.

152.  Defendants used excessive force against Plaintiff ERIC GERSBACHER by refusing to loosen or remove the plastic flexi-cuffs that the Defendants had placed around Plaintiff's wrists.

153.  Defendants used excessive force against Plaintiff ERIC GERSBACHER by grabbing, picking up, and forcing Plaintiff ERIC GERSBACHER to the ground.

154.  Defendants used excessive force against Plaintiff ERIC GERSBACHER in pinning Plaintiff ERIC GERSBACHER to the ground.

155.  Defendants used excessive force against Plaintiff ERIC GERSBACHER in striking Plaintiff ERIC GERSBACHER multiple times while they were pinning him to the ground.

156.  Defendants used excessive force against Plaintiff ERIC GERSBACHER by continuing to pin Plaintiff ERIC GERSBACHER to the ground despite the fact that Plaintiff ERIC GERSBACHER on multiple occasions informed Defendants that he was unable to breathe and having an asthma attack.

157.  At no point during the above-mentioned actions did the circumstances presented to the Defendants support any of the above-mentioned applications of force on Plaintiff ERIC GERSBACHER.

158.  Plaintiff ERIC GERSBACHER was subjected to excessive force in violation of his rights as guaranteed under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.


## FIFTH CLAIM FOR RELIEF
## DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS
## UNDER 42 U.S.C. §1983

159.  Plaintiff ERIC GERSBACHER repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

160.  The Defendants acted under color of law to deprive Plaintiff ERIC GERSBACHER of his civil, constitutional and statutory rights to due process of law pursuant to the Fourth and Fourteenth Amendments of the United States Constitution and are liable to Plaintiff Amil Stewart under 42 USC §1983 and the New York State Constitution.

161.  The Defendants knew or should have known that Plaintiff ERIC GERSBACHER faced a substantial risk of permanent disability, and disregarded that risk by denying needed medical treatment to Plaintiff ERIC GERSBACHER directly for his asthma attach, and constructively denying treatment to Plaintiff ERIC GERSBACHER for the injuries to his wrists by threatening Plaintiff ERIC GERSBACHER with unspecified violence if he requested medical treatment while in custody.

162.  The Defendants' deliberate indifference caused Plaintiff ERIC GERSBACHER to sustain serious and permanent injury.

163.  Plaintiff ERIC GERSBACHER was damaged by the deliberate indifference of the Defendants.

164.  As a result of Defendants' impermissible conduct, Plaintiff demands judgment against defendants in a sum of money to be determined at trial.

## SIXTH CLAIM FOR RELIEF
## RETALIATION FOR FIRST AMENDMENT PROTECTED EXPRESSION
## UNDER 42 U.S.C. § 1983

165.  Plaintiff ERIC GERSBACHER repeats, reiterates and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

166.  Plaintiff ERIC GERSBACHER was present as a participant or observer in First Amendment protected expression at an OWS gathering at the time of the incident in question.

167.  The Defendant POLICE OFFICERS, tackled and struck and arrested Plaintiff ERIC GERSBACHER in order to retaliate against Plaintiff ERIC GERSBACHER for being present at an OWS event.

168.  The Defendant POLICE OFFICERS tackled and struck and arrested Plaintiff ERIC GERSBACHER in order to chill and deter the continuing First Amendment protected expression of other OWS participants and observers present at the time of the incident

169.  Plaintiff ERIC GERSBACHER was not engaged in any illegal activity of any kind or sort when the Defendant POLICE OFFICERS tackled and struck and arrested him.

170.  The Defendant POLICE OFFICERS utilized excessive force against Plaintiff ERIC GERSBACHER in order to retaliate against him for lawfully exercising his First Amendment protected rights to free speech, expression, and association.

171.  As a result of the Defendant POLICE OFFICERS' actions, Plaintiff ERIC GERSBACHER was in fact unable to continue to participate in OWS-related events and activities.

172.  The actions of the Defendant POLICE OFFICERS heretofore described, were designed to and did cause bodily harm, pain and suffering in direct retaliation for Plaintiff ERIC GERSBACHER's exercise of his civil and constitutional rights of free speech, free expression and expressive association as guaranteed by First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

173.  As a result of the foregoing, Plaintiff ERIC GERSBACHER is entitled to compensatory damages and punitive damages against the Defendants in amounts to be determined at trial.

174.  As a result of the above constitutionally impermissible conduct, Plaintiff ERIC GERSBACHER was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

175.  As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
### MUNICIPAL LIABILITY UNDER *MONELL* ARISING FROM
### UNCONSTITUTIONAL POLICIES AND CUSTOMS UNDER 42 U.S.C. § 1983

176.  Plaintiff ERIC GERSBACHER repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

177.  Defendants harassed, battered, berated and caused Plaintiff ERIC GERSBACHER

to suffer significant and painful injuries to his back, neck, shoulders, arms, and wrists in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that their conduct would jeopardize Plaintiffs' liberty, well-being, safety and constitutional rights.

178.  The acts complained of were carried out by the aforementioned individual defendant Police Officers in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

179.  The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

180.  The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department include, but are not limited to, the following unconstitutional practices:

a) wrongfully arresting individuals without probable cause due to perceived lack of respect for the police officer (i.e., "contempt of cop" arrests);

b) wrongfully arresting individuals without probable cause in attempts to justify excessive uses of force (i.e. "contempt of cop" "cover charge" arrests);

c) wrongfully arresting innocent persons and brutalizing innocent persons in order to deter and chill those and other individuals from continuing participation in First Amendment protected expressive activities in New York City; and

d) wrongfully inhibiting and deterring efforts to establish police accountability for excessive force and wrongful arrests by means of the "Blue Wall of Silence."

**CONTEMPT OF COP AND COVER CHARGE ARRESTS**

181.  Upon information and belief, police officers in the City of New York and other municipalities nationwide frequently make arrests in the absence of the commission of any crime by the person arrested, motivated by a desire to punish the arrestee for the arrestee's putative failure to display the degree of deference or subservience demanded by the arresting officers. Such arrests are frequently referred to as "contempt of cop" arrests.

182.  Upon information and belief, police officers in the City of New York and other municipalities nationwide make "contempt of cop" arrests in the absence of a crime, they frequently justify the arrest by falsely reporting that the arrestee has committed a crime. Such charges are frequently referred to as "cover charges."

183.  Upon information and belief, police officers in the City of New York and other municipalities nationwide frequently charge crimes such as disorderly conduct, resisting arrest, obstruction of governmental administration as cover charges.

184.  A November 19, 1997 New York Times special report on police brutality predicated on perceived or actual disrespect of New York City Police Officers noted that at that time, Defendant CITY OF NEW YORK did not monitor or track police use or levying of charges such as disorderly conduct or resisting arrest.[1]

185.  November 19, 1997 New York Times special report on police brutality predicated on perceived or actual disrespect of New York City Police Officers noted that at that time, Defendant CITY OF NEW YORK did not monitor or track police use or levying of charges such as disorderly conduct or resisting arrest, despite considerable anecdotal evidence that New York City Police Officers were arresting individuals on those and other like charges to justify use of force and/or to punish those individuals for "contempt of cop." See fn1.

186.  The above-cited New York Times special report noted that Los Angeles had already instituted a system for tracking the initiation and dispositions of "contempt of cop" and "cover charge" charges such as resisting arrest and disorderly conduct as of the time of that article's publication in 1997. See fn1.

187.  Upon information and belief, the policies, customs and practices of Defendant CITY OF NEW YORK, and the New York City Police Department have not changed significantly since the time of that article's publication in 1997.

188.  For example, in July 2008, police stopped and arrested Michael Cephus in the Lower East Side area of Manhattan. As reported in the New York Post July 30, 2008, after two officers placed Mr. Cephus on the ground, one of the officers began "whaling away" at Mr. Cephus with his nightstick. Two bystanders captured the beating on video. The two men who filmed the beating were arrested and charged with disorderly conduct.[2]

189.  As reported in the New York Daily News on June 16, 2010, Queens councilman Dan Halloran was given a ticket for blocking a crosswalk when he stopped to take pictures of a New York City Police Department vehicle that Mr. Halloran had observed driving recklessly and violating traffic laws on its way to a Dunkin' Donuts.[3]

---

[1] Sontag, Deborah, and Barry, Dan, "CHALLENGE TO AUTHORITY: A special report.; Disrespect as Catalyst for Brutality," New York Times, November 19, 1997. Article incorporated by reference herein and available online at http://query.nytimes.com/gst/fullpage.html?res=9807E7D9163BF93AA25752C1A96195 8260&scp=8&sq=contempt+of+cop&st=cse&pagewanted=all

[2]  Alpert, Lukas I., and Weiss, Murray, "2nd Video Gives NYPD Black Eye." New York Post, July 29, 2008. Article incorporated by reference herein and available online at: http://www.nypost.com/p/news/regional/item_EZ7SbCpNNtsxar3MnXJ5JM

[3] Trapasso, Clare, "Queens councilman Dan Halloran irate over light-running, yakking traffic cop Daniel Chu," New York Daily News, June 16, 2010. Article incorporated by reference herein and available online at http://www.nydailynews.com/ny_local/queens/2010/06/16/2010-06-

190.  As reported by NBC New York television news on July 22, 2010, two officers who were videotaped beating a defenseless arrestee, Walter Harvin, arrested Mr. Harvin and charged him with resisting arrest and disorderly conduct in order to justify their attack upon Mr. Harvin. One of the officers involved was criminally charged as a result.[4]

191.  As reported by a Brooklyn City Councilman in July, 2007, two bystanders observing a young man who was handcuffed and immobilized being beaten by police officers, were themselves beaten and arrested when they asked the officers to stop beating the defenseless arrestee. One of the bystanders was charged with obstruction of governmental administration, resisting arrest and disorderly conduct.[5]

192.  A recent article by *Reuters News* sheds light on this unnecessary escalation and creation of more substantial charges in its review of New York City Police Department stops. Reuters' analysis showed, particularly in its evaluation of the NYPD'S policing of the Brownsville region of Brooklyn, that the undertaking of contempt of cop arrests often create situations in which individuals who have been stopped by New York City Police Officers for pre-textual or otherwise dubious alleged violations may find themselves facing yet more substantial charges due to the oft-times confrontational nature of police-civilian encounters that may cause the tempers of all parties and participants involved to unnecessarily escalate.[6]

193.  Reuters noted particularly the statement of "Anthony Mitchell, who runs an outreach program for young blacks called "Man Up!", [who] says that too often a stop-and-frisk can turn into multiple charges. *Challenging a trespassing or loitering charge can lead to a disorderly conduct charge, and then just a few more wrong moves can add a charge of resisting arrest or even assaulting an officer, a felony.* 'These things can spin out of control easily,' Mitchell said." See fn8 (Emphasis Added).

---

16_queens_councilman_dan_halloran_irate_over_lightrunning_yakking_traffic_cop_d anie.html#ixzz0r1xDq82S.

[4] Scharr, Jillian, "Video Released in Police Brutality Case," NBC New York, June 22, 2010. incorporated by reference herein and available online at http://www.nbcnewyork.com/news/local/Video-Released-in-Police-Brutality-Case-96882129.html

[5] Shabazz, Saeed "Activist lawyers beaten by Brooklyn police," FinalCall.com News, July 12, 2007. Article incorporated by reference herein and available online at http://www.finalcall.com/artman/publish/article_3711.shtml

[6] Francescani, Chris, et al. "Insight: Under Siege: 'Stop and Frisk Polarizes New York" Reuters, July 3, 2012. Article incorporated by reference herein and available online at http://www.reuters.com/article/2012/07/03/us-usa-newyork-stopandfrisk-idUSBRE86205Q20120703

194.  Upon information and belief, Defendant CITY OF NEW YORK and the New York City Police Department continue to resist calls for disclosure statistics concerning minor crimes such as the typical "cover charge" crimes.[7]

195.  Upon information and belief, the "contempt of cop" and "cover charge" charges levied most regularly by New York City Police Officers are disorderly conduct, resisting arrest, and obstruction of governmental administration.

196.  Upon information and belief, "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, obstruction of governmental administration, and violations of the NYPRR are relatively easy for police to levy in the absence of actual probable cause because they may arise out of nearly any police-civilian interactions.

197.  Upon information and belief, "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, obstruction of governmental administration, and violations of the NYPRR are relatively easy for police to levy in the absence of actual probable cause because they can be levied solely upon the allegations of the arresting officer(s) without reference to physical evidence or witness observation of criminal acts.

198.  Upon information and belief, Defendant CITY OF NEW YORK has been, and continues to be, aware of the prevalence of the problem of officers of the New York City Police Department making baseless "contempt of cop" arrests, and bringing false "cover charges" against the arrestees, but has failed to take action to remedy the problem.

199.  Upon information and belief, to date Defendant CITY OF NEW YORK has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

200.  Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration, for personal vindication and/or as pretexts to justify use of force, to date Defendant CITY OF NEW YORK has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

---

[7] Rivera, Ray and Baker, Al, "Data Elusive on Low-Level Crime in New York City," The New York Times, Nov. 1, 2010. Article incorporated by reference herein and available online at http://www.nytimes.com/2010/11/02/nyregion/02secrecy.html?scp=1&sq=Data%20Elusive%20on%20Low-Level%20Crime%20in%20New%20York%20City&st=cse.

201.  Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration, as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date Defendant CITY OF NEW YORK has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

202.  Upon information and belief, and despite due and repeated notice that New York City Police Officers such as Defendants have charged and continue to charge individuals with crimes and violations such as resisting arrest, disorderly conduct, obstruction of governmental administration, or fabricating a crime or violation as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date Defendant CITY OF NEW YORK has not implemented any particular oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

203.  The Defendant POLICE OFFICERS' arrest of Plaintiff ERIC GERSBACHER is believed to have been motivated in whole or in part by the aforesaid custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, obstruction of governmental administration, or fabricating a violation or crime for personal vindication and/or as pretexts to justify use of force, and/or to justify punitive false arrests because each of his arrest was undertaken in a manner which indicated that the individual Defendants who participated in Plaintiff ERIC GERSBACHER's arrest made the determination to arrest despite the fact that Plaintiff had not engaged in any criminal or illegal conduct of any kind or type.

### THE PERVASIVE CUSTOM OR PRACTICE OF EMPLOYING EXCESSIVE FORCE AND PRETEXTUAL AND FALSE ARRESTS TO CHILL FIRST AMENDMENT PROTECTED EXPRESSION BY OWS AND OTHERS

204.  Upon information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against persons engaged in the practice of exercising their First Amendment Protected rights to free speech and association.

205.  Upon information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against person specifically engaged in the practice of exercising their First Amendment Protected rights to free speech and association while participating in or observing assemblies, marches, and events related to Occupy Wall Street.

206.  In January 2012, the concentrated and collaborative efforts of seven law school clinics throughout the United States founded the *Protests and Assembly Rights Project* in

order to "Investigate… the United States' response to Occupy Wall Street in light of the government's international legal obligations."[8]

207.  These same concentrated and collaborative efforts helped the *Protests and Assembly Rights Project* draft and thereafter, in July of 2012, publish, "Suppressing Protest: Human Rights Violations In The U.S. Response To Occupy Wall Street" ("The Report"); wherein, the authors state, "In many instances, the… [NYPD] have responded aggressively to nonviolent protests, and have escalated situations —— through arbitrary or misapplications of the law, an excessive police presence, or the use of unwarranted force. The police response has thus . . . undermined basic assembly and expression freedoms [and] [a]t times . . . presented a threat to the safety of New Yorkers." See fn8 at [internal pagination] 71.

208.  In efforts to explain and/or identify the source of the NYPD's "aggressive responses to nonviolent protests", The Report calls attention to the fact that, "in recent years, New York City has witnessed a shift from 'reactive' policing to 'proactive' policing under Commissioner Raymond Kelly's 'Safe Streets, Safe City' initiative…. [meaning] that police adopt measures in advance to minimize the potential impact and size of a protest, which might include preparing a large police force to arrive at a scheduled protest location before the event begins, or regulating permits for the protest in a manner designed to redirect the protest." See fn8 at [internal pagination] 30 (internal citations omitted).

209.  Despite the positive implications in the title of Commissioner Kelly's 'Safe Streets, Safe City' initiative, this 'proactive' form of policing has failed to keep OWS protesters, observers, and bystanders alike safer, but instead, has led to repeated and continuing acts of police officers committing "clear violations of the government's obligation to uphold assembly and expression rights…. [amounting together to] protest suppression[.]"  See fn8 at [internal pagination] 71.

210.  Further, The Report cites several instances of "Overpolicing and Poor Communication" conducted by the NYPD, where generally "[a]t times, the number of officers on hand [at OWS assemblies, marches, and events] has rivaled or even exceeded the number of protestors . . . repeatedly, the number of visible police [has been] manifestly excessive in comparison to both the peaceful nature of the assembly and the number in attendance at the protests." to wit; "[o]casionally, officers in visibly threatening "hard" uniform (e.g.. body padding, helmets, shields) have attended protests, including small protests posing no evident threat." See fn8 at 82.

211.  Witnesses have observed NYPD officers who have been assigned to perform crowd control duties and overall help provide for individuals' safety instead strike, beat, and otherwise berate civilians without reason, without notice, and without consequence; to wit, "One protestor . . . reported being punched in the left temple by an officer, without

---

[8] Sarah Knuckley et al., "Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street" (2012). Report incorporated by reference herein and available online at: http://chrgj.org/documents/suppressing-protest-human-rights-violations-in-the-u-s-response-to-occupy-wall-street/

any apparent provocation or notice [and thereafter] [t]he punch led to swelling, bleeding, bruising, dizzy spells, and nausea [which required] the individual [to seek] emergency medical treatment[,]" further, "[one legal observer who was also a retired New York Supreme Court judge] . . . witnessed an officer throw a woman to the ground 'out of nowhere' and hit her in the head[,]" and still further, "[one video from an OWS event] shows that an officer approached a woman from behind and grabbed her by the strap of her backpack and her scarf for no apparent reason[;] the officer [then] began to pull the woman towards him . . . for approximately fifteen seconds, and appeared to possibly be choking her via the strap of her scarf [and after this incident] the police appeared not to take any action [against the officer]." See fn8 at 73, 74, and "Appendix I[:] Table of Alleged Police Use of Force Incidents."

212.  More specific incidents of excessive force by NYPD officers months after the Defendant POLICE OFFICERS' acts of brutalizing and arresting Plaintiff ERIC GERSBACHER appear in The Report; wherein the authors state, "A significant number of incidents were reported on March 17-18"; to wit, "[despite the fact that] there [have been] no reports or indications of any imminent or ongoing criminal activity or danger to public safety posed by the [March 17th] assembly," . . . "[o]ne journalist described the night as *'the most violent police response'* he had seen at an Occupy Protest" and included incidents of NYPD officers' use of excessive force including though not limited to, "punch[ing] a woman in the side of her head, and repeatedly shov[ing] protestors from behind[,]" further "[an officer responding to a protester who was approaching him in order to greet him by] shov[ing] him twice hard in the chest[,]" and still further, "after [the officers' order to disperse that evening officers were seen] slam[ming] an Occupy [volunteer] [para]medic's head into a glass door, [with such force that the glass was smashed]." See fn8 at 74, and 75. (emphasis added).

213.  The Report posits how, following incidents of police brutality such as these, the conduct of the NYPD in response to OWS assemblies, marches, and events has and continues to cause "[p]rotestors [to] reasonably perceive that they cannot safely protest [and thus remain] constantly on guard for potential arbitrary police force, or decide to leave the assembly[,]"; and as a result OWS participants, observers, and bystanders and civilians generally "view a[n] NYPD officer as someone who can take out [his] baton and beat [an individual] and face no repercussion." See fn8 at 81.

214.  Or further, stated differently by a graduate student who had attended multiple OWS events before and leading up to The Report's publication, "'It's a shock when you expect police to protect you, but you see them beat people . . . [I] grew up thinking that the cops are 'the good guys' but . . . when you see them beat people for no reason, it changes your world. You don't feel safe." See fn8 at 82.

215.  In suggesting positive changes that the NYPD should employ to effectively curb and prevent its officers from engaging in repeated, continuing and widespread acts of excessive force in response to OWS assemblies, marches, and events specifically and individuals' exercising of their First Amendment protected rights generally, The Report states, "[Government agencies] have an international legal obligation to investigate, prosecute, and remedy human rights violations[;] [t]his obligation requires [government agencies] to have in place systems that enable individuals to have 'accessible and

effective remedies' to vindicate their rights . . . [t]he obligation to investigate and punish violations 'requires that not only the direct perpetrators of human rights violations be punished.'" See fn8 at 68.

216.  Upon information and belief, Defendant CITY OF NEW YORK has been, and continues to be, aware of the prevalence of the problem of officers of the New York City Police Department engaging in excessive force in order to effectively chill OWS participants', observers', and bystanders' specific as well as individuals' general exercise of their First Amendment protected rights to free speech, expression, and association, but has failed to take action to remedy the problem.

217.  Upon information and belief, Defendant CITY OF NEW YORK continues to resist collection and disclosure of data concerning the prevalence of police brutality utilized in order to effectively chill civilians' exercise of their First Amendment protected rights, instead choosing to conceal the problem from the public in order to continue its policy of acquiescence in such practices without fear of public or political backlash.

218.  Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit shortcomings and deficiencies in the New York City Police Departments' recruitment, training, and management practices that allow the continuation of the practice and custom of NYPD officers' use of excessive force and police brutality in order to effectively chill civilians' exercise of their First Amendment protected rights.

219.  Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit flawed and/or deficient systems of reporting, oversight, and accountability that allow the continuation of the practice and custom of NYPD officers' use of excessive force and police brutality in order to effectively chill civilians' exercise of their First Amendment protected rights.

## A DECADES-LONG CONTINUING PATTERN OF CONDONING POLICE EXCESSIVE FORCE AND MISCONDUCT

220.  Defendant CITY OF NEW YORK's knowledge and condonation of the continuing customs and practices that caused Plaintiff's injury precede the inception of the OWS movement, and have been repeated and clear for nearly twenty (20) years.

221.  On July 7, 1994, a blue ribbon panel led by Hon. J. Milton Mollen ("The Mollen Commission") presented the report of its nearly two-year investigation into allegations of NYPD corruption, undertaken in 1992 at the behest of then-Mayor David Dinkins ("The Mollen Commission Report,").[9]

---

[9] Mollen, Baer, Evans, Lankler, Tyler, Armao, Cornfeld, "The City of New York Commission to Investigate Allegations of Police Corruption and The Anti-Corruption Procedures of The Police Department Commission Report," July 7, 1994, City of New York.  Incorporated by reference herein and available online at

222.  The Mollen Commission Report was subtitled "ANATOMY OF FAILURE: A PATH FOR SUCCESS."  The Mollen Commission Report at page before "i."

223.  The July 7, 1994 Mollen Commission Report was prepared for and at the request of the Defendant CITY OF NEW YORK, and therefore knowledge of its contents may be imputed to Defendant CITY OF NEW YORK.

224.  The Mollen Commission Report found that police officers commonly covered up their fellow officers' misconduct, including but not limited to excessive applications of force against civilians, in accordance with a custom or practice known as a "code of silence" or "Blue Wall of Silence."

225.  The above-referred custom or practice of members of the New York City Police Department known as the "Blue Wall of Silence" was discussed at length on pages 53-59 of the July 7, 1994 Mollen Commission Report.

226.  One police officer who testified before the Mollen Commission explained that the code of silence "…starts in the Police Academy, and it just develops from there…. It starts with the instructors telling you never to be a rat, never give up your fellow officer.  It starts with other recruits telling you they'll never give you up, and it just goes down the line as you go… into a precinct."  The Mollen Commission Report at 55.

227.  Another officer who testified before the Mollen Commission stated that "[c]ops don't tell on cops.  And if they did tell on them, just say if a cop decided to tell on me, his career's ruined.  He's going to be labeled as a rat…. he's going to have nobody to work with.  And chances are if it comes down to it… [the whistleblower's fellow officers are] going to let him get hurt." The Mollen Commission Report at 53-54.

228.  A third officer who testified before the Mollen Commission concurred, stating: "[i]f you're labeled a rat… you're going to have a difficult time for the remainder of your career…. [i]t was something that you couldn't shake." Id. at 54.

229.  An NYPD lieutenant who testified before the Mollen Commission confirmed that officers are at times "ostracized" for breaking the code of silence. Id.

230.  An NYPD captain who disciplined his subordinates for misconduct and reported allegations of corruption to NYPD Internal Affairs explained to the Mollen Commission that he had been transferred to thirty-eight (38) different commands in the course of his career, and in almost every case "he found evidence that his reputation had preceded him.  At one command, his locker was burned; at another, his car tires were slashed; at another, he received threats of physical harm." Id.

231.  The *Mollen Commission Report* explicitly identified police brutality, including "implicit or explicit threat[s] of physical harm[,]" and official tolerance thereof, as critical issues that must be investigated by "any Commission investigating police corruption." Id. at 44.

_____

http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf

232.  The *Mollen Commission* went on to fault the NYPD's intelligence gathering regarding incidents of brutality as "wholly inadequate." Id. at 45.

233.  The *Mollen Commission* found that "[police b]rutality is… used as a rite of initiation to prove that an officer is a tough or 'good' cop, one who can be accepted and trusted by his fellow officers not to report wrongdoing." Id. at 47.

234.  One officer who testified before the Mollen Commission noted that brutality "is a form of acceptance.  It's not simply giving a beating.  It's the other officers begin [sic] to accept you more." Id.

235.  The Mollen Commission also found that NYPD "supervisors sometimes turn a blind eye to evidence of unnecessary violence…. [b]ecause a complaint usually comes down to an officer's word (and often the word of fellow officer witnesses) against the… [complainant's] word, it is easy for a supervisor to let clear acts of brutality slide by without recourse."  The Report at 49.

236.  As of the July 7, 1994 *Mollen Commission Report,* Defendant CITY OF NEW YORK had notice that the officers and commanders of the New York City Police Department tolerated and encouraged police to lie to cover up the wrongful conduct of themselves and their fellow officers, including conduct like that which was perpetrated by the Defendant POLICE OFFICERS upon Plaintiff ERIC GERSBACHER.

237.  On information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the custom or practice of officers employing excessive force against civilians.

238.  On information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the enabling custom or practice of officers actively or passively covering up other officers' misconduct, including but not limited to employing excessive force against civilians.

239.  The failure of Defendant CITY OF NEW YORK to meaningfully address these issues was underscored when the non-governmental organization Human Rights Watch conducted a study examining common obstacles to accountability for police abuse in fourteen large cities, including Atlanta, Boston, Chicago, Detroit, Indianapolis, Los Angeles, Minneapolis, New Orleans, New York, Philadelphia, Portland, Providence, San Francisco, and Washington, D.C.[10]

240.  Research for this report was conducted over two and a half years, from late 1995 through early 1998.  See fn10.

241.  The report stated: "The barriers to accountability are remarkably similar from city to city. Shortcomings in recruitment, training, and management are common to all. So is the fact that officers who repeatedly commit human rights violations tend to be a small

---

[10] "Shielded from Justice: Police Brutality and Accountability in the United States," Human Rights Watch, June 1998.  Report incorporated by reference herein and available online at http://www.hrw.org/legacy/reports98/police/index.htm

minority who taint entire police departments but are protected, routinely, by the silence of their fellow officers and by flawed systems of reporting, oversight, and accountability. Another pervasive shortcoming is the scarcity of meaningful information about trends in abuse; data are also lacking regarding the police departments' response to those incidents and their plans or actions to prevent brutality. Where data do exist, there is no evidence that police administrators or, where relevant, prosecutors, utilize available information in a way to deter abuse." See Id.

242.  The report documented that the official response of the New York City Police Department and the City of New York, to credible, persistent reports of abuse was to deny the existence of the problem. See Id.

243.  The report documented that the New York City Police Department, and the City of New York failed to discipline officers in all but 1% of incidents in which complaints were filed with the Civilian Complaint Review Board. See Id.

244.  Upon information and belief, the report was presented to Mayor Rudy Giuliani of the City of New York.

245.  Upon information and belief, the Mayor denounced the report without reading it.

246.  Upon information and belief, Kenneth Roth, then Executive Director Human Rights Watch wrote in an open letter to the Mayor on July 14, 1998: "Rather than engage in a serious discussion of the problem of police brutality in New York City, you attacked those who raised the issue -- apparently without even reading the advance copy of the report we had sent you."

247.  Upon information and belief, Defendant CITY OF NEW YORK has been, and continues to be, aware of the prevalence of the problem of officers of the New York City Police Department engaging in excessive force, but has failed to take action to remedy the problem.

248.  That the Defendant CITY OF NEW YORK continued to have notice after 1994 that the officers and commanders of the New York City Police Department continued to tolerate and encourage police to lie to cover up the wrongful conduct of themselves and their fellow officers after the publication of the Mollen Commission Report can be shown with reference to the following cases:

    a.  **Ariza v. City of New York**, 1996 U.S. Dist. LEXIS 20250, 14 (E.D.N.Y. March 7, 1996) ["The [municipal] defendants concede, however, that the code exists to prevent other officers from reporting corruption or dishonesty by fellow officers…. [t]he principle behind the 'blue wall of silence' is that officers will suffer recrimination for breaking ranks and subjecting police conduct to public scrutiny."]

    b.  **White-Ruiz v. City of New York**, 1996 U.S. Dist. LEXIS 15571, 23 (S.D.N.Y. October 21, 1996) ["[P]laintiff offers sufficient evidence to permit a reasonable trier of fact to infer that the 'blue wall of silence' constitutes a custom or usage of the Department."]

    c.   **United States v. Rosario**, 237 F. Supp. 2d 242, 248 (E.D.N.Y. 2002)
["[Assistant U.S. Attorney] Palmer testified that while supervising the
federal investigation into the Louima assault, she routinely confronted a
'blue wall of silence' erected by police officers and PBA officials intent
on obstructing efforts to uncover the full truth about what had happened at
the 70th precinct on August 9, 1997."]

    d.   **Barry v. New York City Police Dep't**, 2004 U.S. Dist. LEXIS 5951, 40-
41 (S.D.N.Y. April 7, 2004) ["[P]laintiff's witnesses speak from firsthand
experience about the blue wall of silence…. Plaintiff complains of acts
that are of the precise nature as the customs and practices described in the
[Mollen Commission] Report."

    e.   **Griffin v. City of New York et al.**, 10-CV-01824 (E.D.N.Y. 2010)
[Plaintiff detective sues on pattern of retaliation following his reporting
fellow detective to Internal Affairs, fellow officers cover for detective
accused of misconduct, see, e.g., at ¶35: "Internal Affairs conducted its
investigation into [Detective] Plaintiff's allegations [of misconduct]
against [Detective] McCarthy. All of the material witnesses failed to
cooperate with the investigation by being less than truthful…. [a]s a result,
the allegations made by Plaintiff against McCarthy were dismissed as
unsubstantiated."]

249.  Upon information and belief, the above-referred constitutionally violative
policies, practices and customs remain widespread, open, and notorious throughout the
NYPD to date.

250.  Upon information and belief, the policymakers of the NYPD and Defendant
CITY OF NEW YORK are aware that these practices and customs of NYPD officers
continue to date, and have failed to take adequate steps to curb these practices and
customs, which regularly cause the violation of citizens Constitutional rights.

251.  Defendant CITY OF NEW YORK has failed to meaningfully curb these
Constitutionally-violative customs and practices to date.

252.  In the introduction to the Mollen Commission Report, it is noted that "the
[Internal Affairs] system designed to protect the [New York City Police] Department
from corruption minimized the likelihood of uncovering it." The Mollen Commission
Report at 3.

253.  The Mollen Commission Report explained that at that time, the Internal Affairs
Division (re-named the Internal Affairs Bureau in a 1993 restructuring) attempted "to
close cases with as little effort as possible…. One officer told us they sit around and 'eat
donuts and do crossword puzzles' -- and the supervisors and commanders did little
more…. an anonymous survey of the work conditions and attitudes of IAD
investigators… revealed that almost half of IAD investigators' time was spent on non-
investigatory matters  --  and more of their 'investigative' work was done without ever

leaving their office…. The facts confirmed IAD's do-nothing reputation." The Mollen Commission Report at 85.

254.  Since the Mollen Commission Report was published in 1994, the number of complaints of police corruption and other misconduct logged annually by NYPD Internal Affairs has nearly quadrupled, rising from 14,789 logs received in 1994 to 44,994 logs received in 2006, the last year for which NYPD reporting is available.  *NYPD Internal Affairs 2006 Annual Report*, 12-13.[11]

255.  Over that same time period, the number of corruption and other police misconduct complaints investigated annually by NYPD Internal Affairs has fallen by more than half, from 2,258 investigations in 1994 to 1057 investigations in 2006. *Id.*

256.  More information relating to these customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department is available in "THE PRICE OF BRUTALITY: A special report.; Police Complaints Settled, Rarely Resolved." *The New York Times*, September 17, 1997.[12]

257.  Upon information and belief, the steady decline in investigations by NYPD Internal Affairs since the publication of the Mollen Commission Report is representative of a return to a "business-as-usual" mentality with respect to police corruption and brutality within the NYPD.

258.  Defendant CITY OF NEW YORK has had notice through the annual NYPD Internal Affairs reports that NYPD Internal Affairs is not effectively fulfilling its mandate of policing NYPD corruption and brutality generally.

259.  Upon information and belief, Defendant CITY OF NEW YORK has had notice through the annual NYPD Internal Affairs reports that NYPD Internal Affairs is not effectively curbing the established and widespread customs and practices of NYPD officers employing brutality with impunity and covering for one another's misconduct.

260.  As a result of the aforementioned continuing conduct, customs and practices of the Defendants, Plaintiff ERIC GERSBACHER's constitutional rights were violated.

261.  As a result of the above constitutionally impermissible conduct, Plaintiff ERIC GERSBACHER was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

---

[11] 1993-2006 Internal Affairs Reports available online at: http://www.nyclu.org/news/nyclu-releases-16-years-of-nypd-corruption-reports

[12] Sontag, Deborah & Barry, Dan, *The New York Times*, Sept. 17, 1997 available online at http://www.nytimes.com/1997/09/17/nyregion/price-brutality-special-report-police-complaints-settled-rarely-resolved.html?pagewanted=all&src=pm

262.  As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Award appropriate declaratory and injunctive relief.

[d] Empanel a jury.

[e] Award attorney's fees and costs.

[f] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:        New York, New York
              September 18, 2014

                    Respectfully submitted,


              _____~//s//~_____
              SAMUEL B. COHEN [SC 0622]
              STECKLOW COHEN & THOMPSON
              217 CENTRE STREET- FLOOR 6
              New York, New York 10013
              [212] 566-8000
              [212] 202-4952/FAX
              SAM@WYLIELAW.COM
              ATTORNEYS FOR PLAINTIFF