UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ERIC GERSBACHER,                                    :
                                                    :
                                    Plaintiff,      :
                                                    :
                    -v -                             :
                                                    :
THE CITY OF NEW YORK, OFFICER                       :
GONZALEZ, OFFICER RAMIREZ, DEPUTY                   :
INSPECTOR EDWARD WINSKI, and JOHN                   :
DOE POLICE OFFICERS 1-10,                           :
                                                    :
                                    Defendants.     :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/2/17

1:14-cv-7600-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

Plaintiff Eric Gersbacher was arrested while participating in Occupy Wall Street ("OWS")

demonstrations in Zuccotti Park three days after the movement's inception.  On the morning of

September 20, 2011, Gersbacher and numerous other OWS participants were gathered in the park.

Officers of the New York City Police Department were also on the scene.  The demonstrators used

tarps to shelter themselves and their personal belongings, hanging some to trees and tying other

tarps to other objects.  But that morning, the defendant police officers enforcing a New York City

administrative code that prohibited the erection of "obstructions" in public places took action to

remove the tarps.

Inspector Edward Winski, following orders from Department Chief Esposito, used a

bullhorn to order a crowd to step away from an arrangement of tarp-covered shopping carts, boxes,

and personal items.  Despite the order, Gersbacher, who asserted that he did not hear the command

to disperse, stepped onto a portion of the tarp covering the structure and invited others to gather

around.  After another order for people to move, Gersbacher sat down on the tarp and began

banging a saucepan with a drumstick.  Following a brief encounter with Inspector Winski,

Gersbacher was arrested and charged with obstructing governmental administration and resisting

arrest.  He spent one night in police custody, but returned to Zuccotti Park after his release.  He

remained in the park for another week along with other OWS participants until his return home to

Buffalo, New York.

Gersbacher sued the City of New York and individual officers involved in his arrest under

42 U.S.C. § 1983, alleging claims for false arrest, excessive force, failure to intervene, deliberate

indifference, retaliation for the exercise of his First Amendment rights, and municipal liability.  The

Court denied Defendants' motion to dismiss the complaint.  Defendants now move the Court for

summary judgment on all claims.  Because genuine disputes of material fact exist as to the

reasonableness of the amount of force used in Gersbacher's arrest, summary judgment is DENIED

as to the excessive force claim.  However, because probable cause existed for Gersbacher's arrest,

summary judgment as to the remainder of Gersbacher's claims is GRANTED.

## I.    BACKGROUND[1]

On September 20, 2011, Plaintiff Eric Gersbacher was arrested in Zuccotti Park.  Pl.'s Rule

56.1 Counterstatement (ECF No. 96) ("Pl.'s 56.1") ¶ 28–29.[2]  The events leading up to and

accompanying his arrest form the basis of his claims.

Gersbacher arrived in Zuccotti Park in lower Manhattan in New York City on September 17,

2011 to participate in the Occupy Wall Street ("OWS") protests.  *Id.* ¶ 2.  Gersbacher slept in the

park from then until September 28, 2011, when he returned home to Buffalo, New York.  *Id.*  The

only exception was the night of September 20, 2011, a night that he spent in police custody as a

result of the incident that sparked this lawsuit.  *Id.* ¶¶ 48-49.  During the demonstrations, OWS

participants sought shelter for themselves and their personal belongings under tarps tied to trees and

---

[1] The following facts are drawn from the parties' Local Civil Rule 56.1 Statements and other submissions in connection with the instant motion and are undisputed or taken in the light most favorable to Gersbacher, unless otherwise noted.

[2] References to "Pl.'s 56.1" are to Gersbacher's Rule 56.1 counterstatement submitted in connection with Defendants' motion for summary judgment.  Gersbacher's Rule 56.1 counterstatement contains both the assertions of the moving party and the responses of the non-moving party.

secured in other manners. *Id.* ¶ 6.

On the morning of September 20, 2011, several members of the New York City Police Department were present in the park and the surrounding area, including Defendant Inspector Edward Winski, Chief of Department Joseph Esposito, and Lieutenant Daniel Albano. *Id.* ¶ 3. Inspector Winski was the commanding officer of the first precinct at the time. Def.'s Response to Pl.'s Revised Affirmative Local Rule 56.1 Statement ("Def.'s Resp.") (ECF No. 99) ¶ 59.[3] He received orders from Chief Esposito to remove tarps that OWS participants had placed in the park. Decl. of Amy Robinson in Supp. of Def.'s Mot. for Summ. J. (ECF No. 83) ("Robinson Decl."), Ex. G, at 358:5–11, 363:20–25. In connection with the order, Inspector Winski spoke with Lieutenant Albano, Director of the Criminal Section of the NYPD's legal department, who was there to provide other officers with legal counsel.[4] Pl.'s 56.1 ¶ 4; Robinson Decl., Ex. G, at 358:5–11.

A three- to four-foot structure[5] had been assembled adjacent to a park bench. Pl.'s 56.1 ¶¶ 6, 13. The structure was composed of shopping carts, boxes, and personal belongings all covered by a blue tarp that was tied to the shopping carts. *Id.* ¶¶ 6, 13, 30. The tarp extended over the structure and covered the bench. *Id.* ¶ 13. Defendant Inspector Winski was among several police officers

---

[3] References to "Def.'s Resp." are to Defendants' response to Gersbacher's Revised Affirmative Rule 56.1 Statement, which contains both the assertions of the non-moving party and the responses of the moving party.

[4] The parties dispute the substance of that conversation. Defendants assert that Lieutenant Albano advised Chief Esposito and Inspector Winski that a tarp-covered "structure" inside the park was unlawful. Pl.'s 56.1 ¶ 4. Defendants rely on Inspector Winski's deposition testimony that "Lieutenant Albano told Chief Esposito and myself that the structure inside Zuccotti Park was in violation of the law." Robinson Decl., Ex. G, at 358:8–11. Gersbacher highlights that Lieutenant Albano testified in deposition that he could not recall the conversation with Inspector Winski. Pl.'s 56.1 ¶ 4; Pl.'s Decl. in Opp. to Summ. J. (ECF No. 89) ("Pl.'s Decl."), Ex. 7, at 25:15–26:7. To the extent those statements are proffered to show the reason for Inspector Winski's removal of the tarps in Zuccotti Park, the Court will consider them.

[5] The Court uses the term "structure" to refer to the tarp-covered shopping carts, boxes, and personal items at the heart of the events giving rise to Gersbacher's claims. The parties dispute whether this construction was indeed a "structure." But the significance of this dispute is unclear, as the local law that police sought to enforce does not contain the term. See N.Y.C. Admin. Code § 16-122(b) (prohibiting the erection of "sheds, buildings and obstructions"). By using the term "structure" the Court makes no determination with respect to the parties' arguments as they relate to the lawfulness of the shopping cart/box/tarp conglomeration based on its characterization as a "structure." The Court simply finds this term the most appropriate to describe the agglomeration of objects.

who gathered near the structure. *Id.* ¶ 3. Inspector Winski used a bullhorn to address the crowd that had gathered in the park.[6] Pl.'s 56.1 ¶ 14. At that time, Gersbacher was within ten feet of Inspector Winski, Pl.'s 56.1 ¶ 9, and heard Inspector Winski "asking some people" to "move," Robinson Decl., Ex. F, at 111:20–112:10. Facing the tarp-covered structure, Inspector Winski notified those in the crowd that they had one minute to remove "it" then he was going to remove "it."[7] Pl.'s 56.1 ¶ 8; Robinson Decl., Ex. E, at 01:00–01:04. Inspector Winski then instructed those gathered to "step back." Pl.'s 56.1 ¶ 8; Robinson Decl., Ex. E, at 01:08–01:11.

Gersbacher moved onto the portion of the tarp that covered the bench and, in a voice loud enough for others to hear, directed people to "gather" in the "center." Pl.'s 56.1 ¶ 12–13; Robinson Decl., Ex. F, at 55:11–16. Inspector Winski, again using the bullhorn, gave further instructions to "move back" and to "step back." Pl.'s 56.1 ¶ 14; Robinson Decl., Ex. E, at 01:31–01:34.

At some point, Gersbacher sat down on the tarp, facing away from Inspector Winski, and began banging on a saucepan with a drumstick.[8] Robinson Decl., Ex. F, at 54:22–55:2; Def.'s Resp.

---

[6] Defendants' 56.1 Statement states that Inspector Winski notified the crowd that police would be enforcing a local law by removing a "structure" that was covered by multiple tarps in the park. Pl.'s 56.1 ¶ 6. In support of this assertion, Defendants rely on paragraph twenty-two of Plaintiff's complaint, in which Gersbacher alleges that police, including Inspector Winski, "had indicated that they would enforce New York City Administrative Code § 16-122(b), forbidding the leaving of goods or erection of structures in public places, to remove any tarps tied to trees or otherwise secured so as to provide shelter to OWS participants or their belongings." Pl.'s Compl. (ECF No. 1) ¶ 22. Defendants also rely on Gersbacher's deposition testimony, in which he states generally that police were attempting to remove the tarp on which Gersbacher was sitting. Pl.'s 56.1 ¶ 6. Defendants further assert that video footage submitted by Gersbacher depicts Inspector Winski notify the crowd via bullhorn that the tarps were illegal structures that had to be removed by those gathered or else he would remove them. Def.'s 56.1 ¶¶ 7–8. Gersbacher responds that Inspector Winski's statements to the crowd on the video are largely indiscernible. Pl.'s Resp. 56.1 ¶¶ 7-8; Def.'s Decl., Ex. E, Pl. Video 2, 00:32–00:47, 01:02–01:18. The Court has reviewed the video and finds Inspector Winski's statement audible.

[7] Gersbacher asserts that the video footage fails to support Inspector Winski's statements because those statements in the captured footage are "not audible." Pl.'s Resp. 56.1 ¶ 8. The Court has reviewed the video and disagrees. The Court also notes that this is not an issue of disputed fact. Gersbacher denies hearing Inspector Winski's statements but points to no evidence apart from his audit of the video of the incident that suggests they were never made.

[8] Defendants assert that after Gersbacher sat down and began banging with the saucepan, Inspector Winski ordered him to "Get off the tarp," citing to video footage for support. Def.'s 56.1 ¶18. Gersbacher correctly notes that the video does not show either Inspector Winski at that moment nor the person or persons to whom Inspector Winski's order was directed. Pl.'s Resp. 56.1 ¶ 18; Robinson Decl., Ex. E, at 01:45. Because Gersbacher states that Inspector Winski never gave him that order to leave the tarp, the Court will accept his view of this fact and will not consider Defendants' assertion.

¶ 77; Pl.'s 56.1 ¶15.  Inspector Winski stepped up onto the tarp-covered bench behind Gersbacher, briefly grabbed Gersbacher's collar, and instructed him to leave the tarp, saying, "Hey buddy, time to go."  Pl.'s 56.1 ¶¶ 19–20, 22.[9]  Gersbacher stood, turned around to face the officers, and yelled, "Don't you dare touch me" followed by "What are you doing?"  *Id.* ¶ 23; Robinson Decl., Ex. E, at 01:51–01:54; Robinson Decl., Ex. F, at 59:19–21.  Inspector Johnny Cardona joined Inspector Winski on the tarp-covered bench, and, while Gersbacher took steps backwards shouting, "No, no no," Inspectors Cardona and Winski grabbed him and threw him off the tarp into a group of other officers and then onto the ground.[10]  Pl.'s 56.1 ¶¶ 25–26, 28; Robinson Decl., Ex. E, at 01:55–02:00; Def.'s Resp. ¶ 82.  As officers attempted to handcuff Gersbacher, he raised his left arm straight up in the air.  Pl.'s 56.1 ¶ 31.

While police officers escorted Gersbacher out of the park with his hands behind his back, he alerted them that he was having an asthma attack and needed medical attention.  Def.'s Resp. ¶ 85; Robinson Decl., Ex. E, at 04:20–04:23.  He then fell to the ground, with one hand in flex cuffs and the other pinned underneath his body.  Def.'s Resp. ¶ 85; Robinson Decl., Ex. E, at 04:32–04:34.  While Gersbacher was on the ground, officers used their hands and knees to apply weight to his neck, head, and back.  Def.'s Resp. ¶ 85; Robinson Decl., Ex. E, at 04:34–05:46.  After pulling him up to a sitting position, officers finished handcuffing his wrists.  Def.'s Resp. ¶ 85; Robinson Decl., Ex. E, at 04:34–05:46.  Officers then allowed an OWS medic to treat Gersbacher with an inhaler, one minute and thirty seconds after Gersbacher first informed the officers that he was having an

---

[9] At different places in the record, the parties indicate that Inspector Winski "tapped" Gersbacher on the shoulder at this point in the chain of events.  *See* Robinson Decl., Ex. G, at 191:9–11, 192:7–11; Def.'s Resp. ¶ 77.  Neither party disputes that Inspector Winski either grabbed Gersbacher's collar or tapped his shoulder.

[10] Gersbacher claims that the inspectors grabbed him, threw him into a group of officers, and slammed him to the ground.  Pl.'s Opp. to Summ. J. (ECF No. 92) ("Pl.'s Opp.") at 11; Def.'s Resp. ¶ 82.  Gersbacher cites to video evidence in support.  Def.'s Resp. ¶ 82.  The parties dispute the characterization of the video footage.  *See id.*  The Court accepts for purposes of this motion the facts as viewed by Gersbacher, the non-moving party.

asthma attack.[11]  Def.'s Resp. ¶ 85; Robinson Decl., Ex. E, 05:50–05:55.  Sergeant Martha Rosado, who was also on the scene, used a pocket knife to cut the tarp covering the structure away from the shopping carts.  Robinson Decl., Ex. L, at 108:7–22; Pl.'s 56.1 ¶ 30.

At the time of Gersbacher's arrest, Officer Allan Gonzalez was across the street, standing by the police van.  Pl.'s 56.1 ¶ 38.  He did not participate in Gersbacher's arrest or handcuffing.  *Id.* ¶¶ 37–38.  Officer Gonzalez first saw Gersbacher when officers brought him over to the van for transport to the precinct.  *Id.* ¶39.  Officer Gonzalez was assigned Gersbacher's arrest for processing.  Id. ¶ 36.  He transported Gersbacher to the first precinct, where he was examined by two Emergency Medical Technicians (EMTs).  *Id.* ¶¶ 40, 42.  Gersbacher asked the EMTs to loosen or remove the flex cuffs, complaining that his hands were numb and purple.  Robinson Decl., Ex. F, at 66:1–22.  Officer Gonzalez eventually cut the flex cuffs off using a pair of EMT scissors.  Pl.'s Decl., Ex. 8, at 200:17–25.  At the precinct, Gersbacher also reported an injury to his shoulder, and EMTs examined a cut on his left elbow.[12]  Robinson Decl., Ex. F, at 66:22–23, 67:9–10, 68:11–12. Though Gersbacher did not report anything further to the EMTs, he also sustained what he later described in his deposition testimony as "a long lasting abrasion" to his forehead.  Robinson Decl., Ex. F, at 68:21–24.  When shown a still photograph of his face from video of the incident during his deposition, however, Gersbacher was unable to identify any injury to his head.  *Id.* 132:1–6; Pl.'s 56.1 ¶ 47.

Gersbacher was subsequently transported to central booking by a number of officers,

---

[11] Defendants allege that after the inhaler was administered, Gersbacher resisted officers' attempts to escort him to a van to be transported to the police precinct, citing to video footage in support.  Pl.'s 56.1 ¶ 35 (citing to Robinson Decl., Ex. M, at 02:00–02:20).  The Court has reviewed the cited footage, and finds that it does not support Defendants' proposition.  Accordingly, the Court will not consider this factual allegation.

[12] Defendants assert in their 56.1 Statement that Gersbacher alerted the EMTs only to his alleged injury due to the tight flex cuffs.  Pl.'s 56.1 ¶ 44.  In support, they cite to Gersbacher's deposition testimony, but in that testimony, he also states that he complained of a shoulder injury, Robinson Decl., Ex. F, at 66:22–23, and the EMTs examined a cut to his elbow that had been bleeding through his shirt, *id.* at 67:9–16, 68:11–12.

including Officer Ramirez. Robinson Decl., Ex. D, at 105:10–11. After arriving at central booking, Gersbacher was examined by two additional EMTs. Pl.'s 56.1 ¶ 43. Gersbacher informed those EMTs that he wanted to go to the courtroom before receiving medical assistance. Pl.'s 56.1 ¶ 46; Robinson Decl., Ex. D, at 101:11–18, 105:14–25. But, according to him, that decision was influenced by Officer Ramirez, who pressured him into not asking for medical assistance. Pl.'s 56.1 ¶ 46; Robinson Decl., Ex. D, at 105:6–18.

Gersbacher was arraigned the next day on charges of obstructing governmental administration and resisting arrest. Pl.'s 56.1 ¶ 48. He was issued a notice to appear and released on his own recognizance. *Id.* ¶ 49.

After his release from custody, Gersbacher returned to Zuccotti Park. Pl.'s 56.1 ¶ 50. He ultimately sought medical treatment two days later. *Id.*; Robinson Decl., Ex. D, at 31:13–22. He stayed in the park until returning home to Buffalo, New York, on September 28, 2011. Pl.'s 56.1 ¶ 2. Gersbacher later accepted an adjournment in contemplation of dismissal of all charges that had been brought against him. *Id.* ¶ 51.

In the days and weeks following his arrest, Gersbacher made several comments on his Facebook account[13] about his experience, boasting that he "got arrested like a cool kid" and "was in the moment and [] decided to stand up and it spread awareness of the movement all over the world". *Id.* ¶ 52. In the comments, he also explained that he "did it knowing it'd make the whole thing stronger." *Id.* Gersbacher also attended more than ten OWS general assembly meetings after his arrest. *Id.* ¶ 54.

### 1. Procedural History

Gersbacher initiated this action on September 19, 2014, asserting claims under 42 U.S.C. §

---

[13] The parties describe these comments differently. Defendants characterize them as "posts." Def.'s 56.1 ¶ 52. Gersbacher, however, claims that the comments were made through "chat" communications, noting that a "post" would be accessible by a general audience but a "chat" only by a single individual. Def.'s Resp. 56.1 ¶ 52. Whether the comments were "posts" or "chats" is immaterial for purposes of this motion.

1983 for violations of his First and Fourteenth Amendment rights. ECF No. 1. He alleges that the individual defendants are liable to him for false arrest; failure to intervene to prevent violations of his constitutional rights; use of excessive force; deliberate indifference to his serious medical needs; and retaliation for his exercise of his First Amendment rights. *Id.* He also asserts that the City of New York bears responsibility for these violations under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Id.* On April 7, 2015, Defendants moved to dismiss all of Gersbacher's claims pursuant to Rule 12(b)(6), on the basis that Gersbacher had failed to state a claim upon which relief could be granted, and alternatively, that Defendants were entitled to qualified immunity. ECF No. 15. The Court denied that motion on September 25, 2015. ECF No. 30. Defendants filed an answer to Gersbacher's complaint on October 22, 2015. ECF No. 35.

Defendants have moved for summary judgment on all claims.

## II.    STANDARD OF REVIEW

Defendants are entitled to summary judgment on a claim if they can "show[ ] that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To defeat a motion for summary judgment, a plaintiff "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "[M]ere speculation or conjecture

as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citations omitted). A plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002); *see also Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (citation omitted). "[T]he judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 553 (quoting *Anderson*, 477 U.S. at 252); *see also Battino v. Cornelia Fifth Ave., LLC*, 861 F. Supp. 2d 392, 400 (S.D.N.Y. 2012) ("To avoid summary judgment, all that is required of the non-moving party is a showing of sufficient evidence supporting the claimed factual dispute as to require a . . . jury's resolution of the parties' differing versions of the truth." (citing *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006))).

## III.    DISCUSSION

To establish a claim under 42 U.S.C. § 1983, a plaintiff must show that there has been a denial of a right, privilege, or immunity secured by the Constitution or laws of the United States and that the deprivation of such right occurred under color of state law. *See* 42 U.S.C. § 1983; *West v. Atkins*, 487 U.S. 42, 48 (1988). "Section 1983 does not in and of itself create any substantive rights; rather, a plaintiff bringing a § 1983 claim must demonstrate a violation of an independent federal

constitutional or statutory right." *Watts v. N.Y. City Police Dep't*, 100 F. Supp. 3d 314, 322 (S.D.N.Y. 2015) (citing *Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 617-18 (1979)).

### 1. False Arrest Claim

A false arrest claim under Section 1983, premised on an individual's right under the Fourth Amendment to be free from unreasonable seizures "is substantially the same as a claim for false arrest under New York law." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). Under New York law, a plaintiff seeking to establish a cause of action for false arrest must show that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged, such as by probable cause or a warrant. *Willey v. Kirkpatrick*, 801 F.3d 51, 70–71 (2d Cir. 2015) (citing *Broughton v. State of New York*, 335 N.E.2d 310, 314 (N.Y. 1975)).

Defendants do not dispute that they intentionally confined Gersbacher or that he was conscious of the confinement. Rather, they dispute the third element, asserting that Gersbacher's arrest was privileged. An arrest is privileged if probable cause exists for the arrest. *See Ackerson*, 702 F.3d at 19. Defendants first assert that the undisputed facts support the conclusion that there was probable cause for Gersbacher's arrest. Second, they argue, in the alternative, that, even if probable cause did not support the arrest, the individual defendants are entitled to qualified immunity.

### A. Probable Cause for Gersbacher's Arrest

Defendants are entitled to summary judgment on Gersbacher's false arrest claim because probable cause existed for his arrest. Probable cause exists where the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852; *Marlin v. City of New York*, No. 15-cv-2235-CM, 2016 WL 4939371, at *9 (S.D.N.Y. Sept. 7, 2016). "The inquiry is limited to whether the facts

known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013).

It is not necessary for probable cause to have existed "with respect to each individual charge" so long as "probable cause existed to arrest for any crime." *Marcavage v. City of New York*, 689 F.3d 98, 109 (2d Cir. 2012). By the same token, probable cause need not be based on the offense invoked by the arresting officer in making the arrest, "so long as the arrest itself was supported by probable cause, regardless of whether probable cause supported any individual charge identified by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006); *see also Marcavage*, 689 F.3d at 109.

Here, probable cause existed for Gersbacher's arrest for the offense of obstructing governmental administration. Under New York Penal Law § 195.05, a person is guilty of obstructing governmental administration when "he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference." A person may be convicted of obstructing governmental administration if "(1) a public servant is performing an official function; (2) the individual prevents or attempts to prevent the performance of that function by interfering with it; and (3) the individual does so intentionally." *Kass v. City of New York*, 864 F.3d 200, 207 (2d Cir. 2017).

In considering the first element, an officer is deemed to be "performing an official function" if that function is authorized by law. *Id.* at 207. To satisfy the second element, an individual's interference must be physical, and not merely verbal. *Id.* at 209; *People v. Case*, 42 N.Y.2d 98, 101–02 (1977). In determining whether an individual's behavior rises to the level of interference, an officer may nonetheless consider both the individual's actions and his words. *Kass*, 864 F.3d at 209. This element is easily satisfied; an individual need only "intrude himself into, or get in the way of, an ongoing police activity." *Id.* at 210 (quoting *In re Kendell R.*, 897 N.Y.S.2d 83, 84 (N.Y. Sup. Ct. 1st

Dep't 2010)).  To satisfy the third element, "an individual must intend to prevent the public servant from performing the official function."  *Murray v. City of New York*, No. 15-cv-6768-LGS, 2017 WL 3309728, at *4 (S.D.N.Y. Aug. 2, 2017).  Because of the great "practical restraints on police in the field," officers are afforded great latitude in ascertaining intent.  *Kass*, 864 F.3d at 210.

Defendants claim that Gersbacher obstructed governmental administration when he "intentionally obstruct[ed] and impair[ed] officers' efforts to uphold" New York City Administrative Code § 16-122(b) ("Section 16-122(b)") by getting on top of the tarp, encouraging other protestors to join him, and by refusing to move after Inspector Winski gave orders to do so.

Section 16-122(b) provides that:

> It shall be unlawful for any person, such person's agent or employee to leave, or to suffer or permit to be left, any box, barrel, bale of merchandise or other movable property whether or not owned by such person, upon any marginal or public street or any public place, or to erect or cause to be erected thereon any shed, building or other obstruction.

N.Y.C. Admin. Code § 16-122(b).  Section 16-122(b), thus, prohibits two types of conduct:  (1) leaving, or causing to be left, "any box, barrel, bale of merchandise or other movable property" on a "public street" or in "any public place"; and (2) the erection of "any shed, building or other *obstruction*."  *Id.* (emphasis added).

The parties do not dispute that Section 16-122(b) applies to Zuccotti Park.  Though privately owned, the park is open to the public and maintained for public use.  *See Waller v. City of New York*, 34 Misc. 371, 372–73 (N.Y. Sup. Ct. 2011) ("Zuccotti Park is a privately owned public-access plaza, created in 1968 by a city planning special permit issued pursuant to then existing authority of the New York City Zoning Resolution, which encouraged the creation of space for public use in exchange for additional or 'bonus' development rights given to the owners of adjoining properties. . . . [T]he special permit requires that Zuccotti Park be open to the public and maintained for public use 365 days per year.").

Gersbacher disputes, rather, that Defendants' efforts to remove the tarp-covered structure were authorized by law and that Gersbacher intended to interfere with that removal. Neither of these disputes saves Gersbacher's claim.

Five years before the events that unfolded here, the Second Circuit found that officers had probable cause to arrest a homeless man while enforcing Section 16-122(b) when the man was sleeping in a shelter fashioned by placing three cardboard boxes together atop a park bench. *Betancourt v. Bloomberg*, 448 F.3d 547, 549–50, 554 (2d Cir. 2006). The panel concluded that in assembling the cardboard shelter, the man violated Section 16-122(b)'s prohibition of "erect[ing] . . . any shed, building or other obstruction." *Id.* at 553 (quoting § 16-122(b)). The panel disagreed with the district court's determination that the cardboard structure could be deemed a box left or permitted to be left in the park, in violation of the first type of conduct prohibited by Section 16-122(b), because the man had not left the boxes but was instead sleeping in them. *Id.* The panel did find, however, that the cardboard structure was an obstruction erected by the man in violation of Section 16-122(b)'s second prohibited class of conduct. *Id.* The panel observed that "erect" means to "put up . . . by the fitting together of material or parts." *Id.* (quoting *Webster's Third New International Dictionary* (1976)). Accordingly, the court concluded that it was reasonable to understand that the fashioning of three boxes into a shelter large enough for a man to crawl into was the "put[ting] up" of something "by the fitting together of material or parts." *Id.* The panel also concluded that the cardboard shelter was an "obstruction" within the meaning of Section 16-122(b), again relying on the plain meaning of "obstruction" and reasoning that "an agglomeration of boxes large enough for a man to fit into would be 'something that obstructs or impedes.'" *Id.*

Just as in *Betancourt*, the structure at issue here was erected in violation of Section 16-122(b). First, the structure was fashioned by "fitting together" shopping carts, boxes, and personal items and tethering to the shopping carts a blue tarp covering. *Id.* Thus, the structure was "put up by the fitting together of material or parts." *Id.* Second, much like the shelter in *Betancourt*, the three- to

four-foot agglomeration here was large enough to be "something that obstructs or impedes." *Id.* Removal of the tarp-covered structure was therefore authorized by the administrative code.

As noted, Gersbacher further argues that there is insufficient evidence in the record to support a determination that he had the intent required to obstruct governmental administration. In evaluating his intent for purposes of determining the existence of probable cause, the Court's "inquiry is limited to . . . the facts known by the arresting officer at the time of the arrest." *Gonzalez*, 728 F.3d at 155. Construing those facts in the light most favorable to Gersbacher, the Court finds a sufficient factual basis on which the arresting officers could conclude that Gersbacher intended to impede their removal of the structure. With Gersbacher within ten feet of Inspector Winski, Winski gave orders over a bullhorn for people gathered in the park near the structure to move and to "step back." Following that order, Gersbacher moved onto the portion of the tarp that was draped over a bench and called on people to "gather" in the "center." Inspector Winski repeated the order to move back, again using the bullhorn. At some point, Gersbacher sat down on the tarp and began banging on a saucepan with a drumstick. Inspector Winski tapped him on the shoulder and told him, "Hey buddy, time to go." In response, Gersbacher immediately stood up and exclaimed, "What are you doing?" and "Don't you dare touch me." Although Gersbacher claims that Inspector Winski's initial orders to move were not directed at him, Gersbacher was in the gathered crowd and standing within feet of Winksi when the orders were given. Given the sequence of events and Gersbacher's proximity to Inspector Winski while Winski was issuing commands, the undisputed facts sufficiently support the conclusion that Gersbacher intended to interfere with the officers' enforcement action.

In sum, the officers' removal of the tarp-covered structure was authorized by law, and the facts available to Inspector Winski at the time sufficiently suggested that Gersbacher's physical interference was intentional. Probable cause therefore existed for Gersbacher's arrest and precludes his claim for false arrest.

**B. Arguable Probable Cause and the Individual Defendants' Qualified Immunity**

While probable cause for Gersbacher's arrest acts as a complete defense to his false arrest claim, *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015); *Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir. 1999), Defendants additionally put forth the argument that the Individual Defendants were entitled to qualified immunity based on the existence of arguable probable cause. "Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982)). Law enforcement officers are entitled to qualified immunity on a Section 1983 claim if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. "Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon*, 66 F.3d at 420 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)); *see also Weyant*, 101 F.3d at 857 ("[P]ublic officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights."). "The objective reasonableness test is met—and the defendant is entitled to immunity—if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon*, 66 F.3d at 420 (quoting *Malley v. Briggs*, 475 U.S. 335, 340–41 (1986)).

In the context of a false arrest claim, "[a]n officer is entitled to qualified immunity . . . if he had arguable probable cause to arrest the plaintiff for any offense, regardless of the offense with which the plaintiff was actually charged." *Kass*, 864 F.3d at 206 (citing *Betts v. Shearman*, 751 F.3d 78, 82–83 (2d Cir. 2014); *Myers v. Patterson*, 819 F.3d 625, 632–33 (2d Cir. 2016); *Zalaski v. City of Hartford*, 723 F.3d 382, 390 n.4 (2d Cir. 2013)). Arguable probable cause exists if "it was objectively

reasonable for the officer to believe that probable cause existed, or . . . officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* (quoting *Myers*, 819 F.3d at 633).

Here, even if probable cause were absent, Inspector Winski would be entitled to qualified immunity for his arrest of Gersbacher because it was objectively reasonable to conclude that probable cause existed to arrest Gersbacher for obstructing governmental administration. First, given the nature of the structure, it was objectively reasonable for Inspector Winski to believe that it had been erected in violation of Section 16-122(b) and that it was within his power to remove the obstruction. Second, based on the facts at the time of Gersbacher's arrest, as discussed above, a reasonable officer could also have believed that Gersbacher's actions in placing himself on top of the tarp, calling others to gather around, and remaining on the tarp after Inspector Winski gave orders over the bullhorn demonstrated his intent to interfere with the structure's removal.

Gersbacher's false arrest claim is accordingly dismissed.

### 2. Excessive Force

Although Gersbacher's false arrest claim does not withstand summary judgment, genuine issues of material fact preclude summary judgment on his excessive force claim. The Fourth Amendment prohibits the use of excessive force in making arrests, and the determination of whether the force used is "excessive" is analyzed under the Fourth Amendment's reasonableness standard. *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "Determining excessiveness requires 'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Brown*, 798 F.3d at 100 (quoting *Graham*, 490 U.S. at 396). This balancing "requires careful attention to the facts and circumstances of each particular case, including the following three factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively

resisting arrest or attempting to evade arrest by flight." *Id.* (internal quotation marks and alterations omitted) (quoting *Graham*, 490 U.S. at 396).

That multi-factor test is not meant to be applied rigidly, however, and "the inquiry into whether force is reasonable requires an objective examination of the 'totality of the circumstances.'" *Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 406 (D. Vt. 2009), *aff'd*, 400 Fed. App'x 592 (2d Cir. 2010) (quoting *Graham*, 490 U.S. at 396–97). Importantly, the "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Brown*, 798 F.3d at 100 (quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted). The "standard is one of objective reasonableness, and the officer's state of mind, whether evil or benign, is not relevant." *Brown*, 798 F.3d at 100–01 (citing *Graham*, 490 U.S. at 397).

In addition to weighing the *Graham* factors, courts in this district have regularly held that a plaintiff must have sustained some injury to maintain a claim of excessive force. *See, e.g., Acosta v. City of New York*, 11-cv-856-KBF, 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012); *Wims v. New York City Police Dep't*, 10-cv-6128-PKC, 2011 WL 2946369, at *4–5 (S.D.N.Y. July 20, 2011). That injury, however, need not be severe. *See Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987) (denying summary dismissal of excessive force claim where plaintiff "testified that she suffered bruises lasting a 'couple weeks'").

Here, Gersbacher claims that Defendants used excessive force in their application of the flex cuffs; by grabbing him, throwing him, and pinning him to the ground; and by keeping him pinned down despite his complaints of an asthma attack. Pl.'s Opp. to Summ. J. (ECF No. 92) ("Pl.'s Opp.") at 9–11. Defendants argue that the Individual Defendants' use of force in effectuating Gersbacher's arrest did not violate his Fourth Amendment rights because any injuries he sustained as a result were *de minimis*.

As an initial matter, the mere act of handcuffing, without something more, cannot support Gersbacher's excessive force claim. "[H]andcuffing a suspect and requiring [him] to place [his]

hands behind [his] back is not a constitutional violation." *Washpon v. Parr*, 561 F. Supp. 2d 394, 407 (S.D.N.Y. 2008). "[O]verly tight handcuffing," however may amount to excessive force. *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008). To evaluate the reasonableness of a plaintiff's handcuffing, the Court considers, among other things, evidence that: (1) the handcuffs were unreasonably tight; (2) the defendants ignored the plaintiff's pleas that the handcuffs were too tight; and (3) the degree of injury to the plaintiff's wrists. *Id.* Handcuffing can support a Section 1983 excessive force claim when the plaintiff suffers injury as a result of the handcuffing, *Usavage v. Port Auth. of N.Y. and N.J.*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013), but that injury must be "beyond temporary discomfort or bruising," *Omor v. City of New York*, No. 13-cv-2439-RA, 2015 WL 857587, at *7 (S.D.N.Y. Feb. 27, 2015); *see also Lynch*, 567 F. Supp. 2d at 468-69 (collecting cases).

Gersbacher testified during his 50-H hearing that his wrists were more than simply numb or bruised; he stated that they were "scarred," Robinson Decl., Ex. D, at 102:15–16. Gersbacher's testimony thus suggests that his handcuffing caused more than temporary bruising or pain and creates a genuine dispute as to the gravity of his handcuff injury, and whether Defendants employed excessive force in securing his wrists must be decided by a jury.[14]

Material factual disputes also exist with regard to Gersbacher's claim of excessive force predicated on Inspector Winski's grabbing, throwing, and pinning him to the ground. In this regard, the *Graham* factors weigh against summary judgment. The severity of the crime for which

---

[14] The record before the Court shows that, when asked about his injuries in deposition, Gersbacher did not repeat that his wrists were scarred, but only indicated that they were numb. Robinson Decl., Ex. F, at 66:14–22. The Court notes, however, that the complete transcript of Gersbacher's deposition was not filed on the record, and the majority of the testimony related to Gersbacher's injuries that is available to the Court is couched in the context of questions about Gersbacher's statements to EMTs. *Id.* at 65:4–68:8. Therefore, the Court is unable to determine whether Gersbacher was questioned in deposition specifically about the extent of the injuries to his wrists and, more particularly, about his previous allegations of scarring. Although the only evidence currently before the Court of any scarring to Gersbacher's wrists consists of his 50-H hearing testimony, the Court, for purposes of this motion, must view that allegation in the light most favorable to Gersbacher as the non-moving party. Gersbacher will have the opportunity to demonstrate the scarring that he sustained to the jury in support of his excessive force claim.

Gersbacher was arrested is slight. Gersbacher faced a maximum penalty of one year of incarceration,[15] and the underlying facts, even as alleged by Defendants, include little more aggressive conduct than standing and sitting on top of a tarp and encouraging others to join him. The evidence does not suggest that Gersbacher posed a threat to the safety of the officers or others. Gersbacher responded to Inspector Winski's tap on the shoulder by standing up and saying, "Don't you dare touch me," but then backed away and yelled "no, no, no" seconds later as Inspectors Winski and Cardona moved toward him. Notably, Defendants do not allege that Gersbacher was fleeing, *cf. Tennessee v. Garner,* 471 U.S. 1, 6–8 (1985), or physically attacking an officer, *cf. Sullivan v. Gagnier,* 225 F.3d 161, 163 (2d Cir. 2000), or even making a move that an officer could reasonably interpret as threatening an attack, *cf. Tracy v. Freshwater,* 623 F.3d 90, 97 (2d Cir. 2010). Indeed, Inspector Winski described Gersbacher's demeanor as merely "standoffish" but did not allege he was violent. Pl.'s Decl., Ex. 4, at 192:21–193:4.

A dispute exists as to whether Gersbacher resisted arrest. Gersbacher admits that he had "an obvious latent intention not to remain and not to be arrested," Pl.'s 56.1 ¶ 27, and that he moved away from Inspectors Winski and Cardona as they came toward him on the tarp. The parties also agree that, at one point while officers attempted to apply the flex cuffs, Gersbacher raised his arm and that, after Gersbacher fell to the ground, only one of his wrists was cuffed. The parties dispute, however, the length of time that it took officers to place the cuffs and the degree to which Gersbacher was actually resisting. Defendants contend that he screamed and struggled for nearly three minutes, that his resistance did not allow officers to finish cuffing him until he was on the ground, and that he purposely laid on his uncuffed hand to prevent the cuffs from being attached. Gersbacher, on the other hand, asserts that he did not struggle or scream for three minutes, that the flex cuffs had been placed on both of his wrists before he fell to the ground, when one hand merely

---

[15] The maximum penalty for obstructing governmental administration, N.Y. PL § 195.05 is one year of incarceration. N.Y. PL § 70.15(1).

slipped out, and that his actions while lying on the ground were a result of his asthma attack, not an attempt to further resist.

Additionally, though Defendants claim that Gersbacher complained of no other injuries when he was seen by the paramedics, Gersbacher testified in his deposition that, as a result of the force used by officers, his shoulder was injured, his left elbow was cut and bleeding through his shirt, and he sustained a "long lasting" abrasion to his forehead. Gersbacher highlights that, while he did not demand to be taken to a hospital while in custody, he complained repeatedly to police officers and EMTs of the tight cuffs and sought medical treatment two days after being released from police custody. Again, the bar to show injury to survive summary judgment on an excessive force claim is low, *Robison*, 821 F.2d at 924, and Gersbacher has produced sufficient evidence to demonstrate an injury that may be suggestive of excessive force.

The Court is mindful of the chaotic and crowded scene at Zuccotti Park, of Inspector Winski's initial inability to secure both of Gersbacher's wrists in the flex cuffs, and of the potential for escalated tension following Gersbacher's call to other protestors to "gather in the center." However, because a dispute exists as to the extent of the injuries that Gersbacher sustained, the extent of his resistance, and the amount of force Inspector Winski used in arresting him, a reasonable jury could find that Inspector Winski's use of force was objectively unreasonable. *See Brown*, 798 F.3d at 100–01.

Furthermore, Inspector Winski is not shielded from liability on this claim by qualified immunity. While qualified immunity is a defense "generally available against excessive-force claims," *Finnegan v. Fountain*, 915 F.2d 817, 822–23 (2d Cir. 1990), that defense is unavailing here. Winski points the Court to the Second Circuit's decision in *Lennon v. Miller*, 66 F.3d 416, 420–21 (2d Cir. 1995). *Lennon*, however, is distinguishable. In *Lennon*, officers sought to arrest the plaintiff when she refused to vacate the driver's seat of a car that lawfully belonged to her estranged husband. *Id.* at 419. Police were in the process of returning the car to her husband and informed her that she was

under arrest for obstructing governmental administration. *Id.* An officer "pulled her hand off the ignition, placed his arm around her neck, shoulder, right arm, and right hand, and forcibly removed her from the car." *Id.* After being released from custody, the plaintiff sought treatment only for a wrist injury. *Id.* The Second Circuit found that no reasonable jury could find the force used was excessive because the plaintiff claimed "no other use of force and no other injury." *Id.* at 426.

Here, on the other hand, Gersbacher has put forth greater evidence than the plaintiff in *Lennon*, both in terms of force and injuries suffered. On this record, the Court cannot conclude that no reasonable jury could find in favor of Gersbacher.

Moreover, the Second Circuit has held that when "the factual record is not in serious dispute . . . [,] [t]he ultimate legal determination whether . . . a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide." *Id.* at 421 (quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990)); *accord Harris v. O'Hare*, 770 F.3d 224, 239 (2d Cir. 2014) (same); *Estate of Jaquez v. City of New York*, 104 F.Supp.3d 414, 434 (S.D.N.Y. 2015) (question of whether a "reasonable police officer should have known he acted unlawfully" is a question of law for the court "[e]ven though a reasonableness inquiry traditionally is a question of fact for the jury"). Conversely, "summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." *Husain v. Springer*, 494 F.3d 108, 133 (2d Cir. 2007) (quoting *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999)).

The Court cannot conclude that Inspector Winski is entitled to qualified immunity at this stage of the litigation because facts material to a determination of the reasonableness of his actions are in dispute. Given the disputed issues of material fact regarding whether and to what extent Gersbacher resisted arrest, the amount of force Inspector Winski used against Gersbacher, and the seriousness of the injuries that Gersbacher sustained, the Court cannot conclude that he is entitled to qualified immunity on the record before it.

### 3. Failure to Intervene

Defendants are entitled to summary judgment on Gersbacher's failure to intervene claim. Gersbacher contends that Defendants breached their duty to intervene on his behalf when he was arrested and when excessive force was used against him. As a preliminary matter, Gersbacher's claim premised on his arrest fails because probable cause existed for that arrest. *See Weyant*, 101 F.3d at 852 ("The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.'" (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)).

Additionally, although sufficient factual disputes exist to preclude summary judgment on Gersbacher's excessive force claim, Gersbacher puts forth no evidence to even suggest that Officers Ramirez and Gonzalez had an opportunity to intervene to prevent any unconstitutional use of force. "A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (citation omitted). However, a law enforcement officer will only be held liable for another officer's use of excessive force, if there was "a realistic opportunity [for the first officer] to intervene to prevent the harm from occurring." *Rogoz v. City of Hartford*, 796 F.3d 236, 251 (2d Cir. 2015) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

Here, Officer Gonzalez was not present at the scene of the arrest. He was across the street. He did not see Gersbacher until after the arrest and the alleged use of excessive force. This hardly demonstrates that Officer Gonzalez had a realistic opportunity to intervene. Gersbacher's failure to intervene claim against Officer Gonzalez is dismissed.

Even more precarious is a claim against Officer Ramirez. Gersbacher asserts that Officer Ramirez was present at Zuccotti Park that morning, but presents no evidence of his location at the time of the use of force. Lacking any factual support in the record, Gersbacher's failure to intervene claim against Officer Ramirez is also dismissed.

#### 4. Deliberate Indifference to Gersbacher's Medical Needs

To state a claim for deliberate indifference to serious medical needs, a plaintiff must satisfy a two-pronged test, alleging, first, a "'sufficiently serious' deprivation of adequate medical care," *Spavone v. New York State Dep't of Correctional Servs.*, 719 F.3d 127, 139 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Salahuddin v. Goord*, 467 F.3d 263, S279 (2d Cir. 2006)), and, second, that the defendant acted with deliberate indifference or a "sufficiently culpable state of mind," *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). These claims, when brought by pretrial detainees "are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). This is because "pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Id.* (citation and internal quotation marks omitted).

To satisfy the first prong, a plaintiff must provide evidence that he or she suffered from an objectively serious medical condition, defined as a "condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway*, 99 F.3d at 553. To satisfy the second prong, a pretrial detainee bringing claims under the Fourteenth Amendment may show a "sufficiently culpable state of mind," *id.*, by proving a defendant's recklessness – that is, that a defendant "'knew, or should have known' that his or her conduct 'posed an excessive risk to health or safety,'" *Lloyd v. City of New York*, 246 F. Supp. 3d 704, ___, slip op. at 9 (S.D.N.Y. 2017) (quoting *Darnell*, 849 F.3d at 33); *Youngblood v. City of New York*, Nos. 15-cv-3541-RA, 16-cv-6100-RA, 2017 WL 3176002, at *4 (S.D.N.Y. July 24, 2017).

Here, Gersbacher's claim is premised on Defendants' indifference to his asthma attack and to alleged wrist injuries caused by the flex cuffs. Defendants contest both the seriousness of Gersbacher's medical conditions and the claim that the Individual Defendants acted with deliberate indifference to them. The parties do not dispute that Gersbacher had an asthma attack or that

police officers allowed an OWS medic to administer an inhaler one minute and thirty seconds after Gersbacher alerted officers of his condition. Assuming *arguendo* that the attack could be construed as a serious medical condition, the minute-and-one-half wait does not amount to "an excessive risk to [Gersbacher's] health or safety." *Lloyd*, 246 F. Supp. 3d at ___, slip op. at 9.

Gersbacher's claim of deliberate indifference related to the individual defendants' disregard for the tightness of his handcuffs also lacks sufficient support in the record. Although Gersbacher alleges that his wrists were scarred as a result of the cuffs, he does not dispute that Officer Gonzalez removed the cuffs prior to having Gersbacher transported to central booking. Gersbacher produces no evidence that officers' failure to remove the cuffs at an earlier time "posed an excessive risk to health or safety." *Id.*

Because Gersbacher fails to prove that Defendants acted recklessly in responding to his requests for medical care, Defendants are entitled to summary judgment on the deliberate indifference claim.

### 5. Retaliation for First Amendment Protected Expression

The essential elements of a First Amendment retaliation claim differ depending on the factual context in which they arise. *Compare Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir. 2004) (requiring, in the prison context, that the prisoner responded to retaliatory conduct by defendants "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights" (quotation marks omitted)), *with Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir. 2001) (requiring that a private citizen, who alleged he was arrested by public officials in retaliation for his unsuccessful campaign to unseat the Village's mayor, show that he was "actually chilled" in exercising his rights (quotation marks omitted)). To prevail on a claim for First Amendment retaliation, a private citizen must prove that: "(1) he has an interest protected by the First Amendment; (2) [the] defendants' actions were motivated or substantially caused by his exercise of that right; and (3) [the] defendants' actions effectively chilled the exercise of his First

Amendment right." *Kuck v. Danaher III*, 600 F.3d 159, 168 (2d Cir. 2010) (quoting *Curley*, 268 F.3d at 73).

Gersbacher argues that his arrest was retaliatory and asserts that his resulting injuries included his physical battery, chilling of his First Amendment rights, his inability to complete his college studies, and termination of his employment. This claim is precluded because, as described in detail above, probable cause existed for his arrest. It is well settled that the existence of probable cause "will defeat . . . a First Amendment claim that is premised on the allegation that defendants prosecuted a plaintiff out of a retaliatory motive, in an attempt to silence [him]." *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012); *see also Curley*, 268 F.3d at 73 (concluding that a finding of probable cause obviates the need to undertake "an inquiry into the underlying motive for the arrest") (citing *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995); *Mozzochi v. Borden*, 959 F.2d 1174, 1179–80 (2d Cir. 1992)). As the Second Circuit reasoned, "'[a]n individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause,' even if that prosecution 'is in reality an unsuccessful attempt to deter or silence criticism of the government.'" *Fabrikant*, 691 F.3d at 215 (quoting *Mozzochi*, 959 F.2d at 1180); *see also Singer*, 63 F.3d at 120; *Marlin*, 2016 WL 4939371, at *14 (concluding that plaintiff's First Amendment retaliation claims must be dismissed following a finding that the plaintiff's arrest was supported by probable cause or, at least, arguable probable cause).[16]

---

[16] Gersbacher's opposition may be read to suggest that Defendants' actions in the park leading up to his arrest were in retaliation for the exercise of his, and other OWS participants', protected rights. Pl.'s Opp. at 21–22. This claim was not made expressly in his complaint. Defendants did not bother to address it in their reply. To the extent that Gersbacher views this as an independent basis for his First Amendment claim, it also fails. As a preliminary matter, Gersbacher has demonstrated that he was engaged in constitutionally protected activity by virtue of participating in the protests in Zuccotti Park. Gersbacher's presence in Zuccotti Park as both a participant and an observer of the political protests certainly falls "within the ambit of constitutional protection." *MacNamara v. City of New York*, 275 F.R.D. 125, 141 (S.D.N.Y. 2011) (finding that plaintiffs "who were present as observers of a political protest" were cloaked in First Amendment protection). Indeed, courts considering First Amendment claims brought by protesting individuals who rely on temporary shelters erected in public forums have found that tents erected and inhabited by OWS participants and other protestors in various cities throughout the country may be forms of protected expression in and of themselves. *See, e.g., Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (assuming, but not deciding, that "overnight sleeping" in a tent in a park opposite the White House "in connection with [a] demonstration is expressive conduct protected to some extent by the First Amendment"); *Occupy Columbia v. Haley*, 866 F. Supp. 2d 545, 557 – 58

### 6. Municipal Liability

Gersbacher has presented insufficient evidence to withstand summary judgment on his

*Monell* claim. "To hold a city liable under § 1983 for the unconstitutional actions of its employees, a

plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2)

causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*,

490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks and alterations omitted); *see Monell v. Dep't*

*of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). Accordingly, "a municipality cannot be made liable [under

§ 1983] by application of the doctrine of *respondeat superior*," *Pembaur v. City of Cincinnati*, 475 U.S. 469,

---

(D.S.C. 2011) (finding that, in the context of a preliminary injunction application, the plaintiffs were likely to establish that their camping on State House grounds in connection with Occupy Columbia was "expressive conduct"); *Mitchell v. City of New Haven*, 845 F. Supp. 2d 238, 246 (D. Conn. 2012) (collecting cases). Defendants remark in a footnote that the law is unsettled as to whether Gersbacher's expression in Zuccotti Park, a privately owned property, is entitled to First Amendment protection. Def.'s Mem. in Supp. of Summ. J. at 16 n.2. Other courts in this district have observed the same. *See, e.g.*, *Bogart v. City of New York*, 13-cv-1017-NRB, 2015 U.S. Dist. Lexis 11311, at *16–17 (S.D.N.Y. Aug. 25, 2015) ("[T]here is no rule clearly establishing that the First Amendment applies in a [privately owned public space] such as Zuccotti Park."); *Caravalho v. City of New York*, 13-cv-4174-PKC, 2016 WL 1274575, at *15. For purposes of this motion, the Court need not decide this issue.

Participation in a protected activity is not all that is required to survive summary judgment on a First Amendment retaliation claim. As the Court has already concluded, Defendants were lawfully engaged in enforcing New York City's administrative code in the park, and probable cause existed for Gersbacher's subsequent arrest. It is axiomatic that "'[a]n individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause,' even if that prosecution 'is in reality an unsuccessful attempt to deter or silence criticism of the government.'" *Fabrikant*, 691 F.3d at 215 (quoting *Mozzochi*, 959 F.2d at 1180).

Moreover, Gersbacher has failed to produce evidence that his First Amendment rights were chilled as a result of officers' enforcement of Section 16-122(b), apart from the consequences of the privileged arrest. *See Kuck*, 600 F.3d at 168 (requiring a private citizen to prove that the "defendants' actions effectively chilled the exercise of his First Amendment right"). The record shows that he returned to Zuccotti Park immediately after his arrest and release from custody and remained there for another week before returning home. Pl.'s 56.1 ¶¶ 48–49. Gersbacher went on to participate in nearly a dozen OWS general assembly meetings. Pl.'s 56.1 ¶ 54. He also spoke openly about his arrest on social media, stating that he "was in the moment and [] decided to stand up and it spread awareness of the [OWS] movement all over the world." *Id.* ¶ 52.

Gersbacher also points to no evidence of any other concrete injury that he suffered as the result of Defendants' law enforcement actions in Zuccotti Park, again, apart from the privileged arrest and its consequences. *See Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) ("Chilled speech is not the *sine qua non* of a First Amendment claim. A plaintiff has standing if he can show *either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm."); *see also Mangino v. Incorporated Vill. of Patchogue*, 808 F.3d 951, 955–56 (2d Cir. 2015) (affirming that a plaintiff may show either chilled speech or another concrete harm). While Gersbacher's arrest could qualify as a concrete injury "because it both halted [his] speech immediately and subjected [him] to criminal charges," *Marom, v. City of New York*, 2016 WL 916424, at *11 (S.D.N.Y. Mar. 7, 2016), that arrest was privileged and cannot give rise to liability, *Fabrikant*, 691 F.3d at 215; *Curley*, 268 F.3d at 73.

478 (1986), but rather the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury," *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (internal quotation marks omitted).

A plaintiff may satisfy the "policy or custom" prong in one of four ways: by proving the existence of (1) a formal policy, *see Monell*, 436 U.S. at 690; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights, *see Pembaur*, 475 U.S. at 483–84; (3) a practice so persistent and widespread that it constitutes a "custom or usage" and implies the constructive knowledge of policymakers, *see Monell*, 436 U.S. at 690-91; or (4) a failure to properly train or supervise municipal employees that amounts to "deliberate indifference to the rights of those with whom municipal employees will come into contact." *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996).

Gersbacher seeks to establish municipal liability by arguing that Chief Esposito and Lieutenant Albano were "final municipal policymakers," *Pembaur*, 475 U.S. at 484, whose decision to remove tarps in Zuccotti Park on September 20, 2011, resulted in the various alleged constitutional violations. The Court is unpersuaded.

Before a municipality's liability can be implicated, there must have been a violation of the plaintiff's constitutional rights. *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992) ("[P]roper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation."). Because the only surviving claim asserted by Gersbacher is that of excessive force premised on a violation of his Fourth Amendment rights, Gersbacher must point to evidence that Chief Esposito and Lieutenant Albano were involved in either the decision to apply such force, or its actual application. *See Pembaur*, 475 U.S. at 483–84 (discussing municipal liability for "unlawful action[s]" and "deliberate choice[s]" taken by the purported policymakers).

Gersbacher points to no evidence in the record to support the conclusion that either Chief Esposito or Lieutenant Albano were involved in any force used in the course of his arrest such that their actions could form the basis for *Monell* liability. Nor is there evidence in the record that either official made a decision related to the amount of force to be used in the event of an arrest. The record indicates that Chief Esposito gave orders related to the removal of tarps in the park. *See* Pl.'s Mem. at 22; Pl.'s 56.1 ¶ 76. It is silent, however, as to Chief Esposito's physical location and actions during Gersbacher's arrest. The record is equally silent as to the whereabouts and activities of Lieutenant Albano at that time. Accordingly, the Court cannot conclude that either official made a decision or took a course of action that led to any excessive force against Gersbacher. *See Caravalho v. City of New York*, No. 13-cv-4174-PKC, 2016 WL 1274575,at *21 (S.D.N.Y. Mar. 31, 2016) (dismissing *Monell* claim related to an arrest at Zuccotti Park during OWS because plaintiff's theory that the defendant officers were "final policymakers with respect to the decision to clear Zuccotti Park based on purported rules violations" bore no "causal link" to plaintiff's excessive force claim).

Even if Chief Esposito or Lieutenant Albano were involved in arresting and using force on Gersbacher, there is insufficient evidence to conclude that either officer had sufficient authority to give rise to municipal liability. Where the contention is not that the defendants' actions were taken pursuant to a formal policy but rather that they were taken or caused by an official whose decisions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved. *See, e.g., Jett v. Dallas Independent School District,* 491 U.S. 701, 737 (1989); *Praprotnik,* 485 U.S. at 123–25. It is not enough that the official has been granted discretion in the performance of his duties. *See, e.g., Praprotnik* at 127. "[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *Id.* at 123 (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986)).

Whether the official in question had final policymaking authority is a legal question, which is to be answered on the basis of state law. *McMillian v. Monroe County,* 520 U.S. 781 (1997) (a proper

"understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law"); *Jett,* 491 U.S. at 737; *Praprotnik,* 485 U.S. at 123–24. "[T]he relevant legal materials[] includ[e] state and local positive law, as well as custom or usage having the force of law." *Jett,* 491 U.S. at 737 (quoting *Praprotnik*, 485 U.S. at 124 n.1) (internal quotation marks omitted). The determination of whether the official is a final policymaker under state law is "to be resolved by the trial judge *before* the case is submitted to the jury." *Id.*

Defendants contend that the Commissioner of the NYPD is the sole "final policymaker" for that department. *See* Def. Reply Mem. in Supp. of Summ. J. (ECF No. 98) at 9. Section 434(b) of the New York City Charter provides that "[t]he commissioner shall be the chief executive officer of the police force. He shall be chargeable with and responsible for the execution of all laws and the rules and regulations of the department." For his part, Gersbacher points to no legislative enactment or other provision of state law that makes either Chief Esposito or Lieutenant Albano the individual with "final policymaking authority" over the amount of force to be used in effectuating arrests. Nor does he point to any delegation by the Police Commissioner to Chief Esposito or Lieutenant Albano of the authority to make such policy. Instead, to show that Chief Esposito was a final policymaker, Gersbacher relies only on evidence that Chief Esposito was the individual within the department who gave the order to remove the tarps in the park on September 20, 2011. *See* Pl.'s Opp. at 22; Pl.'s 56.1 ¶ 76.

That Chief Esposito has the word "Chief" in his title, or that he ordered the removal of the tarps on September 20, 2011, do not make him a "final policymaker" for the City as a matter of law. *See Russo v. City of Hartford*, 341 F. Supp. 2d 85, 108 (D. Conn. 2004) (holding that a police chief could not be deemed a final policymaker because he "remained accountable to department and city policy" and "the City Charter vest[ed] policymaking authority in the City Council and the City Manager"); *see also Allen v. City of New York*, No. 03-cv-2829-KMW-GWG, 2007 WL 24796, at *21–

22 (S.D.N.Y. Jan. 3, 2007) (concluding that evidence that a city official had "full responsibility for the operation of a particular function within a municipality" was insufficient to prove that the official was the "final policymaker" in that area). Gersbacher's argument that Lieutenant Albano is a final policymaker because he testified that he was a policymaker during his deposition is also unconvincing. Whether or not an officer has sufficient authority to constitute a final policymaker is determined as a matter of law, not by the relevant officer's self-regard.

The City Charter grants authority for "the execution of . . . the rules and regulations of the department" to the Commissioner alone. N.Y.C. Charter § 434(b). Gersbacher points to no evidence on which the Court could conclude as a matter of law that Chief Esposito or Lieutenant Albano were delegated final policymaking authority in the area of officers' use of force. *See Jeffes v. Barnes*, 208 F.3d 49, 57–58 (2d Cir. 2000) ("Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law."). Accordingly, Gersbacher's *Monell* claim is dismissed.

## IV.     CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is DENIED with respect to the excessive force claim only and GRANTED as to all other claims.

SO ORDERED.

Dated:  October 2, 2017
New York, New York

_____
GREGORY H. WOODS
United States District Judge